# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 13-60703

United States Court of Appeals
Fifth Circuit

**FILED**

December 11, 2014

Lyle W. Cayce
Clerk

EQUAL EMPLOYMENT OPPORTUNITY COMMISSION,

Plaintiff–Appellant

v.

LHC GROUP, INCORPORATED, doing business as Gulf Coast Homecare,

Defendant–Appellee

Appeal from the United States District Court
for the Southern District of Mississippi

Before BENAVIDES, PRADO and GRAVES, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

Plaintiff–Appellant the Equal Employment Opportunity Commission (EEOC) brought an enforcement action under the Americans with Disabilities Act (ADA) on behalf of Kristy Sones against her employer, Defendant–Appellant LHC Group, Inc., (LHC). Sones worked as a nurse for the home-health company until she was fired shortly after she had an epileptic seizure in May 2009. The district court granted summary judgment for LHC. We affirm in part and reverse in part.

## I. BACKGROUND

LHC hired Kristy Sones, a registered nurse, to work as a Field Nurse in Picayune, Mississippi in 2006. Field Nurses provide home health care to

No. 13-60703

patients: Sones estimated that she spent "probably a couple hours" traveling to see six to eight patients every day.

In March of 2009, Jennifer Taggard, then-Branch Manager at LHC's Picayune facility and Sones's immediate supervisor, decided to promote Sones to a Team Leader position. The parties dispute whether Sones had been promoted or merely was being cross-trained at the time of her termination. Team Leaders manage patient care, schedule field nurses, fill in when nurses are absent, and communicate with patients' doctors and pharmacists.

On May 26, 2009, Sones had a grand mal seizure at work. An ambulance took her to a local hospital and she was released to return to work two days later by her treating physician.

Five days later, on June 1, Sones stopped by LHC's office to discuss her medical condition with Taggard and Thressa Guchereau, Director of Nursing for LHC's Picayune facility. Taggard and Guchereau gave Sones a copy of LHC's Team Leader job description and requested a release from Sones's neurologist. Dr. Michael Mitchell reviewed the description, marked it with ". . . no driving x 1 year, no working on ladder," and released Sones for work. Sones discussed her limitations with Taggard and Guchereau, and the three established that Sones would get rides to work from her coworker and next-door neighbor.

When Sones returned to work the following week, she asked Taggard for "extra help" with the computer-related requirements of her job, including remembering her passwords and using the scheduling software. Sones's new antiseizure medications left her feeling "very tired" and struggling with memory. Sones testified that Taggard responded to her request for help by simply walking away. On Sunday, June 7, Sones worked a shift as a Field Nurse. With Guchereau's approval, Sones's mother drove Sones to several patient homes.

2

No. 13-60703

Testimony suggests that over the following week Sones continued to struggle with several of her duties as Team Leader. Taggard conducted weekly meetings with Sones to "give her some feedback and allow her to ask questions" regarding her Team Leader duties. The record contains conflicting evidence as to the degree of Sones's difficulties and whether Sones was aware of her shortcomings.

On Friday, June 19, Taggard and Guchereau met with Sones to discuss her performance. Management brought several problems to Sones's attention including her subpar computer skills, errors she made while working with patients in the field, and communication and scheduling problems. Taggard and Guchereau set a "target date" of July 31 for Sones to "master" these Team Leader duties. According to Sones's EEOC charge, that same Friday Taggard told Sones that "if [her] disability manifested again while [Sones] was on the job, [LHC] would be in trouble."

The following Monday, Sones missed work without prior approval to take her child to a doctor's appointment. LHC also received a complaint from a patient who requested that Sones not be sent back to her home. LHC decided to terminate Sones.

On Wednesday, June 24, LHC's Human Resources Representative, Lolanda Brown, terminated Sones over the telephone. According to Sones's deposition testimony, Brown said nothing about Sones's performance problems or driving restriction but rather stated: "We're going [to] have to let you go, because you're a liability to our company."

The EEOC filed an enforcement action under Title I of the ADA, 42 U.S.C. §§ 12101–12213, in September 2011. The EEOC alleged that LHC failed to accommodate Sones and discriminated against her on the basis of her disability.

3

No. 13-60703

LHC moved for summary judgment on all claims, and the district court granted its motion. The district court concluded that the EEOC failed to establish a prima facie case of discriminatory discharge because it could not show that Sones was qualified to serve as a Field Nurse or a Team Leader. Next, it found that even if Sones had made a prima facie case of disability discrimination, LHC offered a legitimate reason for terminating Sones that the EEOC could not prove was pretextual. Finally, the district court concluded that, because Sones could not prove she was qualified for either position, the EEOC failed to make a prima facie case of failure to accommodate. This appeal follows.

## II.    DISCUSSION

This case is a public enforcement action under 42 U.S.C. § 2000e-5(f)(1) of the Americans with Disabilities Act. The district court had subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(4), and 1345. This Court has jurisdiction to review the district court's grant of summary judgment under 28 U.S.C. § 1291.

### A.    Standard of Review

We review de novo a district court's grant of summary judgment, viewing "all facts and evidence in the light most favorable to the non-moving party." *Juino v. Livingston Parish Fire Dist. No. 5*, 717 F.3d 431, 433 (5th Cir. 2013). We apply the same standard as the district court in the first instance. *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007).

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when the "'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Royal v. CCC & R Tres Arboles, L.L.C.*, 736 F.3d 396, 400 (5th Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

248 (1986)). "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party succeeds, the onus shifts to "the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324. The court must "draw all reasonable inferences in favor of the nonmoving party" and "refrain from making credibility determinations or weighing the evidence." *Turner*, 476 F.3d at 343 (citation and internal quotation marks omitted).

## B.     Discriminatory Termination

The ADA prohibits an employer from discriminating against a "qualified individual with a disability on the basis of that disability." 42 U.S.C. § 12112(a). In a discriminatory-termination action under the ADA, the employee may either present direct evidence that she was discriminated against because of her disability or alternatively proceed under the burden-shifting analysis first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), a Title VII case. *Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 245 (5th Cir. 2013). This analysis first requires the EEOC to establish a prima facie case of discrimination. *See E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 615 (5th Cir. 2009). If the EEOC is successful, then LHC must articulate a legitimate, nondiscriminatory reason for terminating Sones. *See id.* Finally, the burden shifts back to the EEOC to show that LHC's proffered reason is pretextual. *See id.*

In the Rule 56 context, a prima facie case of discrimination plus a showing that the proffered reason is pretextual is typically enough to survive summary judgment. *Cf. Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S.

No. 13-60703

133, 146–48, 150 (2000) (reaching a similar conclusion in the Rule 50 context, which "mirrors" the standard for summary judgment).

### 1.  *Prima Facie Discrimination*

#### a.  *Applicable Law*

The parties to this action disagree over the elements necessary to establish a prima facie case of discrimination. Their disagreement identifies a discrepancy in the Fifth Circuit's cases evaluating the requisite nexus between an employee's disability and her termination.[1]

Our case law consistently requires the claimant to prove (1) she has a disability and (2) she is qualified for the job she held. *Compare Zenor v. El Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 853 (5th Cir. 1999), *with Burch v. Coca–Cola Co.*, 119 F.3d 305, 320 (5th Cir. 1997). The cases then splinter into three distinct lines regarding causal nexus. One line of cases requires the employee to prove "(3) that he was subject to an adverse employment decision on account of his disability." *Zenor*, 176 F.3d at 853 (citing, *inter alia*, *Robertson v. Neuromedical Ctr.*, 161 F.3d 292, 294 (5th Cir. 1998) (per curiam), and *Robinson v. Global Marine Drilling Co.*, 101 F.3d 35, 36 (5th Cir. 1996)); *see also Chiari v. City of League City*, 920 F.3d 311 (5th Cir. 1991) (interpreting the Rehabilitation Act of 1973, 29 U.S.C.A. § 794(a), the ADA's predecessor). A second line of cases requires the employee to prove "(3) he or she was subject to an adverse employment action; and (4) he or she was replaced by a non-disabled person or was treated less favorably than non-disabled employees." *Burch*, 119 F.3d at 320 (citing *Daigle v. Liberty Life Ins. Co.,* 70 F.3d 394, 396 (5th Cir. 1995)). A third line in essence requires an employee to prove nexus twice, asking her to show "[3] she was subjected to an adverse employment

---

[1] In *Burch v. Coca–Cola Co.*, this Court noted the discrepancy but did not reach the question of which formulation was proper. 119 F.3d 305, 321 (5th Cir. 1997). We held that the employee failed to establish that he suffered from a disability.

action on account of her disability or the perception of her disability, and [4] she was replaced by or treated less favorably than non-disabled employees." *Chevron Phillips*, 570 F.3d at 615 (citing *McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 279 (5th Cir. 2000)).

We apply the first formulation, articulated in *Zenor*, for four reasons. First, the *Zenor* formulation was first used in the disability-discrimination context in *Chiari*, a 1991 case. 920 F.2d at 315. By contrast, the *Burch* formulation was first used in the disability-discrimination context in *Daigle*, a 1995 case. *See* 70 F.3d at 396.[2] Following this Court's rule of orderliness, subsequent panels were and are bound by *Chiari*. *See Jacobs v. Nat'l Drug Intelligence Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008) ("It is a well-settled Fifth Circuit rule of orderliness that one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our *en banc* court." (internal citations omitted)).

Second, *Burch*'s requirement that a plaintiff prove she was replaced by or treated less favorably than non-disabled employees was likely imported from *McDonnell Douglas*—a case focused on discriminatory hiring, not termination. There, the Supreme Court required a plaintiff alleging racially discriminatory hiring practices to prove

> (i) that he belongs to a racial minority; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

---

[2] *Daigle* without explanation imported this element from two non-ADA Title VII cases, *Norris v. Hartmax Specialty Stores, Inc.*, 913 F.2d 253, 254 (5th Cir. 1990), and *E.E.O.C. v. Brown & Root Inc.*, 688 F.2d 338, 340–41 (5th Cir. 1982).

411 U.S. at 802 (footnote omitted). In the *McDonnell Douglas* context, where the employer and the applicant have only a handful of interactions before the allegedly discriminatory hiring decision is made, the subsequent history of the open position is highly relevant to a finding of discrimination. By contrast, where termination is at issue, plaintiffs may draw on their employment history to prove a nexus between their protected trait and their termination. Therefore, rather than articulating the standard for a prima facie discriminatory-discharge claim, the *Burch* line is best understood as providing one possible way to prove nexus between the employee's disability and her termination.

Third, although the Supreme Court has not weighed in on the matter, the other circuits have overwhelmingly required plaintiffs to prove their termination was because of their disability rather than provide evidence of disfavored treatment or replacement.[3]  The *Zenor* formulation is in step with our sister Circuits.

---

[3] *See, e.g.*, *Demyanovich v. Cadon Plating & Coatings, L.L.C.*, 747 F.3d 419, 433 (6th Cir. 2014) ("[P]laintiff must show that (1) he is disabled, (2) he is otherwise qualified to perform the essential functions of a position, with or without accommodation, and (3) he suffered an adverse employment action because of his disability."); *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 544 (10th Cir. 2014) (requiring "evidence that (1) [Plaintiff] is disabled within the meaning of the ADA; (2) he is qualified to perform the essential functions of his job with or without accommodations; and (3) he was terminated 'under circumstances which give rise to an inference that the termination was based on [his] disability'" (citations omitted)); *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (plaintiff must show that: "(1) she is disabled within the meaning of the ADA, (2) she is qualified to perform the essential functions of her job either with or without reasonable accommodation, and (3) she has suffered from an adverse employment decision because of her disability." (citation and internal quotation marks omitted)); *McMillan v. City of New York*, 711 F.3d 120, 125 (2d Cir. 2013) ("[P]laintiff must show by a preponderance of the evidence that: (1) his employer is subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation; and (4) he suffered adverse employment action because of his disability." (citation omitted)); *Jones v. Nationwide Life Ins. Co.*, 696 F.3d 78, 87 (1st Cir. 2012) ("[P]laintiff must show that he (1) is disabled within the meaning of the ADA; (2) is qualified to perform the essential functions of his job with or without a reasonable accommodation; and (3) was discharged or otherwise adversely affected in whole or in part

No. 13-60703

Finally, we decline to apply the third formulation, articulated in *Chevron Phillips*, 570 F.3d at 615, for the additional reason that it requires plaintiffs to prove causation twice. This requirement is inconsistent with *McDonnell Douglas* and at odds with the underlying purpose of anti-discrimination legislation—namely, to remove "artificial, arbitrary, and unnecessary barriers to employment when the barriers operate invidiously to discriminate on the basis of racial or other impermissible classification." *McDonnell Douglas*, 411 U.S. at 801 (quoting *Griggs v. Duke Power Co.*, 401 U.S. 424, 430–31 (1971)); *accord Burch*, 119 F.3d at 313 (noting that the ADA is "designed to remove barriers which prevent qualified individuals with disabilities from enjoying the same employment opportunities that are available to persons without disabilities" (citations and internal quotation marks omitted)).

We therefore follow the *Zenor* line of cases. "To establish a prima facie discrimination claim under the ADA, a plaintiff must prove: (1) that he has a disability; (2) that he was qualified for the job; [and] (3) that he was subject to an adverse employment decision on account of his disability." 176 F.3d at 853.

Because here the first element is uncontested for purposes of summary judgment, we turn to Sones's qualifications for employment.

    *b.*     *Qualification*

To avoid summary judgment, the EEOC must show that either (1) Sones could "perform the essential functions of the job in spite of [her] disability," or, if she could not, (2) that "a reasonable accommodation of [her] disability would

---

because of his disability." (footnote omitted)); *Reynolds v. Am. Nat'l Red Cross*, 701 F.3d 143, 150 (4th Cir. 2012) (requiring "demonstrate[ion] that (1) [plaintiff] 'was a qualified individual with a disability'; (2) he 'was discharged'; (3) he 'was fulfilling h[is] employer's legitimate expectations at the time of discharge'; and (4) 'the circumstances of h[is] discharge raise a reasonable inference of unlawful discrimination.'"(alterations in original) (quoting *Rohan v. Networks Presentations LLC*, 375 F.3d 266, 273 n.9 (4th Cir. 2004)).

No. 13-60703

have enabled [her] to perform the essential functions of the job." *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1093 (5th Cir. 1996) (per curiam) (citing the ADA, 42 U.S.C. § 12111(8), which defines "qualified individual" as "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position . . .").

A function is "essential" if it bears "more than a marginal relationship" to the employee's job. *Chandler v. City of Dall.*, 2 F.3d 1385, 1393 (5th Cir. 1993), *holding modified on other grounds as discussed in Kapche v. City of San Antonio,* 304 F.3d 493 (5th Cir. 2002) (per curiam). The ADA defines "reasonable accommodations" to include

> job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9)(B).

The district court concluded that the EEOC failed to make a prima facie case that Sones was a "qualified individual." We agree with the district court that driving was an essential function of the Field Nurse position and that LHC could have provided no reasonable accommodation. However, we find that there are genuine disputes as to (1) whether driving was an essential function of the Team Leader position; (2) if so, whether LHC reasonably could have accommodated Sones's inability to drive in the Team Leader role; and (3) whether LHC reasonably could have accommodated Sones's difficulty with the essential computer-related and communications duties of a Team Leader. Finally, the parties dispute whether Sones was a Team Leader or a Field Nurse when she was terminated. Because Sones may have been qualified for the former position but not the latter, this dispute is material.

10

No. 13-60703

###### i.    *Driving*

LHC contends that driving is an essential function of both positions. Courts owe deference to an employer's position description: "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). But this deference is not absolute:

> The inquiry into whether a particular function is essential initially focuses on whether the employer *actually requires* employees in the position to perform the functions that the employer asserts are essential. For example, an employer may state that typing is an essential function of a position. If, in fact, the employer has never required any employee in that particular position to type, this will be evidence that typing is not actually an essential function of the position.

Interpretive Guidance on Title I of the Americans With Disabilities Act, 29 C.F.R. pt. 1630, app. § 1630.2(n) (emphasis added). Fact-finders must determine whether a function is "essential" on a case-by-case basis. *Id.*

LHC requires that Team Leaders and Field Nurses have a "[c]urrent Driver's License and vehicle insurance, and access to a dependable vehicle." The position descriptions also emphasize that "[s]ignificant portions (more than 50%) of daily assignments require travel to client/resident/patient locations or other work sites, via car or public transportation." Sones estimated that as a Field Nurse she spent "probably a couple hours" of her eight-hour day driving to patient homes. However, contrary to the written position description, Team Leaders in practice drove far less frequently than did Field Nurses. Statements in Guchereau's deposition qualify the driving requirement in the position description: many Team Leader tasks were performed in the branch office.

11

No. 13-60703

Both LHC's position description and Sones's testimony confirm that Field Nurses are expected to spend large portions of their day driving. Therefore, the district court correctly concluded that as a matter of law driving is an essential function of that job. But because the record contains evidence that traveling was not as prominent a part of a Team Leader's duties as the position description suggests, taking all reasonable inferences in favor of the EEOC, there is a genuine dispute of material fact as to whether driving was an essential function of that position.

LHC next contends that it would have been impossible to reasonably accommodate Sones's inability to drive in either role. The ADA requires employers to make "[m]odifications or adjustments to the work environment, or to the manner or circumstances under which the position held or desired is customarily performed, that enable a qualified individual with a disability to perform the essential functions of that position . . . ." 29 C.F.R. § 1630.2(o)(1)(ii). However, "[t]he ADA does not require an employer to relieve an employee of any essential functions of his or her job, modify those duties, reassign existing employees to perform those jobs, or hire new employees to do so." *Burch v. City of Nacogdoches*, 174 F.3d 615, 621 (5th Cir. 1999) (holding employer was not required to accommodate firefighter who could not fight fires); *see also Barber v. Nabors Drilling U.S.A., Inc.*, 130 F.3d 702, 709 (5th Cir. 1997) ("We cannot say that [an employee] can perform the essential functions of the job with reasonable accommodation, if the only successful accommodation is for [the employee] not to perform those essential functions.").

On the summary-judgment record, we cannot say that a reasonable accommodation would have permitted Sones to complete an essential function that occupied "a couple hours" of a Field Nurse's typical day. The EEOC argues that reasonable accommodations were available: Guchereau permitted Sones to receive rides to six patient calls from her mother on one occasion and

No. 13-60703

Picayune may have had a handful of public transportation options, including van services.[4] But the EEOC has not offered prima facie evidence that any of these potential accommodations was a feasible daily solution. Because driving is such a central part of the Field Nurse position, the district court properly concluded that LHC could not have reasonably accommodated Sones's restriction: Sones was not qualified to work as a Field Nurse.

We reach a different conclusion regarding the Team Leader position. Even if driving were an essential function of a Team Leader, Sones might have carried out the job with reasonable accommodation. *Compare Molina v. DSI Renal, Inc.*, 840 F. Supp. 2d 984, 1003 (W.D. Tex. 2012) (interpreting analogous Texas statute and denying summary judgment when record contained no evidence that providing the requested accommodation would cause employer "undue hardship" and when the accommodation "would cause little to no change in the current working arrangements and would not require scheduling additional employees"), *with Hammond v. Jacob Field Servs.*, 499 F. App'x 377, 382–38 (5th Cir. 2012) (per curiam) (affirming summary judgment when the only available accommodation was to reassign employee tasks all typically distributed among line operators), *and Toronka v. Cont'l Airlines, Inc.*, 411 F. App'x 719, 725 (5th Cir. 2011) (affirming summary judgment when the only reasonable accommodation for an employee's inability to drive was to assign him to non-existent desk-based position). Guchereau's deposition testimony suggests that a taxi or van service might have enabled a Team Leader to adequately discharge her duties, and LHC's position description expressly

---

[4] In a footnote, LHC raised the possible concern that permitting Sones to use public transportation would cause LHC to violate the Health Insurance Portability and Accountability Act, 48 U.S.C. § 1985 (HIPAA). The parties mentioned this briefly at oral argument. Because on appeal LHC raised the HIPAA argument only in a footnote, and because the summary-judgment record contains no undisputed facts to support it, we decline to consider the argument here.

states that travel can be accomplished "via car or public transportation." This evidence raises a genuine dispute as to whether Sones's proposed accommodations were the kind of "job restructuring" the ADA envisions. *See* 42 U.S.C. § 12111(9)(B).

Finally, LHC failed to engage in the ADA-mandated process to consider reasonable accommodations. "Under the ADA, once the employee presents a request for an accommodation, the employer is required to engage in [an] interactive process so that *together* they can determine what reasonable accommodations might be available." *Chevron Phillips*, 570 F.3d at 622. Given the relative infrequency with which she would have been required to drive, Sones's proposed solutions were not so unreasonable that they absolved LHC of its statutory duty to at least discuss accommodation.

Therefore, while the district court properly concluded that the EEOC did not meet its prima facie summary-judgment burden to show Sones was qualified to serve as a Field Nurse, it erred in reaching the same conclusion regarding the Team Leader position. The disputed question of which position Sones actually held is material, precluding summary judgment on qualification.

### ii.    Administrative Duties

The EEOC carried its prima facie summary-judgment burden to show Sones was qualified to perform the computer-related tasks of a Team Leader. As an initial matter, LHC and the EEOC debate the extent to which Sones's disability precluded her from performing these essential functions. LHC points to notes from a meeting between Sones, Guchereau, and Taggard itemizing Sones's errors[5] and to deposition transcripts highlighting Sones's inability to

---

[5] These include failures to schedule appropriate patient care, rude communication with field staff, disorganization, inability to answer questions, and clerical mistakes.

type, use a computer, and remember passwords. LHC argues that Sones was unable to perform even the most basic computer-related functions of the Team Leader position, and that her difficulties predated her seizure. The EEOC concedes that Sones struggled, but it contests LHC's assertion that her difficulties predated her seizure. Sones may not have been aware of these criticisms, as she had not yet had a performance review as Team Leader. Finally, Sones contends that her limitations were largely due to an unusually high dosage of anti-seizure medication, which Sones was in the process of tapering.

If Sones was indeed unable to perform her essential computer-based tasks, then LHC had a duty to work with her toward a reasonable accommodation. As noted, "once the employee presents a request for an accommodation, the employer is required to engage in [an] interactive process so that *together* they can determine what reasonable accommodations might be available." *Chevron Phillips,* 570 F.3d at 622. In *Chevron Phillips*, this Court considered an accommodations dispute in which the employee "attempted to discuss the terms of her release with [her employer] to clarify her needs, but [the employer] refused." *Id.* at 622. We reversed summary judgment, concluding that a reasonable jury could find that the employer "did not attempt to entertain the requested accommodation." *Id.*

The same is true here. Sones expressly reached out to her supervisors, indicating that she wanted temporary help using computer programs and remembering her passwords in light of her high medication levels. Faced with Sones's request for "extra help," Taggard, her supervisor, kept silent and walked away. On this record, a reasonable jury could find that Sones reached out to LHC for accommodation and was denied an interactive process. Because the EEOC has identified a genuine dispute of material fact regarding whether

No. 13-60703

LHC satisfied its duty to accommodate Sones's disability, the district court erred in granting summary judgment on this issue.

    *c.*  *Nexus*

The EEOC sustained its summary-judgment burden to show that Sones "was subject to an adverse employment decision on account of [her] disability." *See Zenor*, 176 F.3d at 853. It is undisputed that Sones suffered an adverse employment action—namely, termination. *See* 42 U.S.C. § 12112(a) ("No covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . ."). To show nexus, the EEOC highlights that Sones's supervisors criticized her performance only after her seizure and that these criticisms were "exaggerated, unfounded, or fabricated." It also points to Taggard's comment, "We're going [to] have to let you go because you're a liability to our company." Similar statements appear in Sones's EEOC charge: "Taggard told me that if my disability manifested again while I was on the job, [LHC] would be in trouble," and "[Brown] told me that I was terminated because I have become a liability to [LHC] because of my disability."

We must first decide a threshold evidentiary question. The district court ruled the statements in Sones's charge were not competent summary-judgment evidence because they are "presumed to be inadmissible hearsay," It relied on persuasive authority from two district courts, *Stolarczyk ex rel. Estate of Stolarczyk v. Senator Int'l Freight Forwarding, LLC*, 376 F. Supp. 2d 834, 842 (N.D. Ill. 2005) and *Thompson v. Origin Tech. Bus., Inc.,* No. 3:99-CV-2077-L, 2001 WL 1018748 at *8 (N.D. Tex. Aug. 20, 2001). We disagree. First, these two cases are inapposite. In *Stolarczyk*, the court found inapplicable the residual exception to hearsay, Federal Rule of Evidence 807. 376 F. Supp. 2d at 841–42. In *Thompson*, the out-of-court statement in question did not qualify as a non-hearsay admission of a party–opponent under Federal Rule of

Evidence 801(d)(2). 2001 WL 1018748, at *8. Neither decision rested on the fact of the EEOC charge.

Second, it is true that courts are often reluctant to credit evidence in EEOC charges, grievances, and claims—fearing that the documents are "inherently unreliable because the charge is drafted in anticipation of litigation." *Walker v. Fairfield Resorts, Inc.*, No. 3:05-0153, 2006 WL 724555, at *8 (M.D. Tenn. Mar. 21, 2006); *see also Tulloss v. Near N. Montessori Sch., Inc.,* 776 F.2d 150, 154 (7th Cir. 1985). On summary judgment, however, courts are precluded from weighing credibility. The EEOC charge is competent for use at summary judgment unless it is inadmissible under the Federal Rules of Evidence or fails to comport with Federal Rule of Civil Procedure 56(c)'s requirements. *See Huckabay v. Moore*, 142 F.3d 233, 240 & n.6 (5th Cir. 1998); *Alvarado v. Shipley Donut Flour & Supply Co.*, 526 F. Supp. 2d 746, 764 (S.D. Tex. 2007).

Here, although the statements contained in the EEOC charge suffer from two layers of potential hearsay infirmities, they fit comfortably within two hearsay exemptions. First, the statements in Sones's charge were made by LHC employees speaking on behalf of the company; they are therefore not hearsay under Federal Rule of Evidence 801(d)(2). Second, Sones's charge repeating the statement is not hearsay because it is not being offered for the truth of the matter asserted, i.e., for the proposition that Sones was in fact a liability. *See* Fed. R. Evid. 801(c)(2). Finally, Sones reproduced the statements in a signed, verified document based on her personal knowledge of the conversation, in accordance with Rule 56(c). *See* Fed. R. Civ. P. 56(c)(4). Therefore, the district court abused its discretion in ruling that the contents of Sones's EEOC charge were not competent evidence for summary judgment.

When viewed in the light most favorable to the EEOC, the chronology of the criticism Sones received and the comments her supervisors made as they

were letting her go raise a genuine dispute of material fact regarding whether Sones was fired on account of her disability. The EEOC has provided enough evidence to survive summary judgment on this point.

### 2.    *Legitimate Reason for Termination*

Because the EEOC has made a prima facie case of discriminatory termination, the burden shifts to LHC to articulate a legitimate reason for its actions. LHC argues that it "terminated Sones for poor performance and her inability to perform the essential functions of her position." Terminating an employee whose performance is unsatisfactory according to management's business judgment is legitimate and nondiscriminatory as a matter of law. *See Walton v. Bisco Indus., Inc.*, 119 F.3d 368, 372–73 (5th Cir 1997) (per curiam); *Smith v. Rockwell Int'l Corp.*, 77 F.3d 473, 473 (5th Cir. 1995) (per curiam) (unpublished) ("Rockwell offered a legitimate reason for placing Smith on medical layoff: Smith's physicians had imposed permanent medical restrictions on his activities that precluded him from performing the material duties of his position."). Therefore, the district court properly concluded that LHC offered a legitimate, nondiscriminatory reason for terminating Sones.

### 3.    *Proffered Reason Pretextual*

Since LHC offered a legitimate reason for terminating Sones, the burden of production shifts back to the EEOC. It must

> offer sufficient evidence to create a genuine issue of material fact either (1) that the defendant's reason is not true, but is instead a pretext for discrimination (pretext alternative); or (2) that the defendant's reason, while true, is only one of the reasons for its conduct, and another motivating factor is the plaintiff's protected characteristic (mixed-motive[s] alternative).

*Rachid v. Jack In The Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004) (citations and internal quotation marks omitted); *see also Evans v. Tex. Dep't of Transp.*, 547 F. Supp. 2d 626, 640 (E.D. Tex. 2007) (applying same analysis to cases under ADA), *aff'd,* 273 F. App'x 391 (5th Cir. 2008) (per curiam). At summary

judgment, "[e]vidence demonstrating that the employer's explanation is false or unworthy of credence, taken together with the plaintiff's prima facie case, is likely to support an inference of discrimination even without further evidence of defendant's true motive." *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003).

The district court correctly concluded that the EEOC did not satisfy the pretext alternative. Rather than disputing LHC's claims regarding Sones' alleged performance deficiencies, the EEOC argues that pretext can be inferred from the fact that LHC failed to document Sones' deficiencies until after her seizure. However, as the district court observed, the record reflects that Sones exhibited performance issues both before and after her seizure. Indeed, Sones herself admitted that prior to her seizure she was having trouble with the computer-related aspects of the Team Leader position. This evidence was corroborated by the testimony of Sones' supervisors as well as a colleague assigned to train her, all of whom testified that Sones was exhibiting performance issues prior to her seizure. Given this record, the EEOC failed to rebut LHC's evidence regarding Sones' unsatisfactory performance and therefore failed to demonstrate pretext.

However, the EEOC's failure to demonstrate pretext does not end the inquiry. Under the ADA, "discrimination need not be the sole reason for the adverse employment decision . . . [so long as it] actually play[s] a role in the employer's decision making process and ha[s] a determinative influence on the outcome" *See Pinkerton v. Spellings*, 529 F.3d 513, 519 (5th Cir. 2008) (citation and internal quotation marks omitted). For this reason, an employee who fails to demonstrate pretext can still survive summary judgment by showing that an employment decision was "based on a mixture of legitimate and illegitimate motives . . . [and that] the illegitimate motive was a motivating factor in the

decision." *Machinchick v. PB Power, Inc.*, 398 F.3d 345, 355 (5th Cir. 2005) (internal quotations omitted).

Several portions of the record support the inference that discrimination was a motivating factor in Sones's termination. First, as noted, Sones reported that Taggard said, "We're going [to] have to let you go because you're a liability to our company." The district court concluded that "[t]his statement is consistent with LHC's reasons for terminating Sones and is not evidence of pretext"—i.e., Sones's mistake in patient care exposed LHC to potential liability. But as the EEOC rightly argues, the statement is also reasonably consistent with LHC fearing that Sones would have another seizure on the job. Because the district court was required to draw all reasonable inferences in favor of the EEOC, *Turner*, 476 F.3d at 343, the court erred in disregarding the statement as evidence of pretext. Further, the statements from Sones's EEOC charge discussed above— "Taggard told me that if my disability manifested again while I was on the job, [LHC] would be in trouble," and "[Brown] told me that I was terminated because I have become a liability to [LHC] because of my disability"—cast doubt on the validity of LHC's purported reason for Sones's termination.

Taken together, the EEOC's prima facie case and Brown's and Taggard's statements raise a genuine dispute of material fact as to whether Sones's disability was a motivating factor in her termination. *See Laxton*, 333 F.3d at 578. Summary judgment on the EEOC's discriminatory-discharge claim was therefore improper.

## C.    **Failure to Accommodate**

The EEOC abandoned its failure-to-accommodate claim on appeal. *Cinel v. Connick*, 15 F.3d 1338, 1345 (5th Cir.1994) ("An appellant abandons all issues not raised and argued in its initial brief on appeal."). The   EEOC   did not devote a section of its appellate brief specifically to this cause of action, nor

did it identify the claim in its statement of issues. Although it discussed whether or not reasonable accommodations were available to LHC, the EEOC did not specify that this line of inquiry pertained to its original failure-to-accommodate claim rather than to the second prong of the discriminatory-discharge action. The cases the EEOC relies on are all either discriminatory-or retaliatory-discharge cases.[6]

Therefore, we affirm the district court's grant of summary judgment on the EEOC's failure-to-accommodate claim.

## III.  CONCLUSION

For the foregoing reasons, we AFFIRM summary judgment on the EEOC's failure-to-accommodate claim. We also affirm partial summary judgment to the extent Sones was a Field Nurse, as she was not qualified for that position. Because genuine disputes of material fact remain regarding (1) whether Sones was promoted to Team Leader, (2) if so, whether LHC could reasonably accommodate her disability, (3) whether LHC engaged in the required interactive process to seek accommodation, and (4) whether Sones was terminated on account of her disability, we REVERSE AND REMAND for further proceedings consistent with this opinion.

---

[6] In making this determination, we note that although their methods of proof are related, "[a] failure-to-accommodate claim under the ADA is distinct from a claim of disparate treatment." *Windhauser v. Bd. of Supervisors for Louisiana State Univ. & Agric. & Mech. Coll.*, 360 F. App'x 562, 565 (5th Cir. 2010). Indeed, Sones's case is most properly brought as a discriminatory-termination action. A failure-to-accommodate claim provides a mechanism to combat workplace discrimination even when the employee in question *has not* suffered adverse employment action. *Cf. Bridges v. Dep't of Soc. Servs.*, 254 F.3d 71, 71 (5th Cir. 2001) (unpublished) ("Although Bridges has suffered no adverse employment action, she may still raise a claim of discrimination based on the alleged failure reasonably to accommodate her disability."). Thus, although we affirm dismissal of the failure-to-accommodate claim on abandonment grounds, issues regarding whether LHC could reasonably accommodate Sones' disability and, if so, whether LHC engaged in the required interactive process, remain relevant to the qualification element of the discriminatory-termination analysis.