# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 15-50779

United States Court of Appeals
Fifth Circuit

**FILED**
September 16, 2016

Lyle W. Cayce
Clerk

DERRICK DILLARD,

> Plaintiff - Appellant

v.

CITY OF AUSTIN, TEXAS,

> Defendant - Appellee

Appeal from the United States District Court
for the Western District of Texas

Before SOUTHWICK and COSTA, Circuit Judges, and OZERDEN[*], District Judge.

GREGG COSTA, Circuit Judge:

Derrick Dillard appeals the grant of summary judgment disposing of his disability discrimination claims against his former employer, the City of Austin. After a car accident left Dillard with lingering injuries that prevented him from performing his former tasks as a manual laborer and field supervisor, the City offered, and Dillard accepted, a new job as an administrative assistant. As a result of performance and behavior in the administrative position, the City eventually terminated Dillard. The questions on appeal are

---

[*] District Judge of the Southern District of Mississippi, sitting by designation

No. 15-50779

whether the new position was a reasonable accommodation and whether the City discriminated against Dillard when it terminated him. We conclude that summary judgment in favor of the City was proper.

## I

Dillard worked as a Street and Drainage Maintenance Senior for the City. This was a blended position that included coordinating a work crew, operating machinery, and performing manual labor such as constructing guard rails. In March 2011, Dillard injured his back and shoulder in an on-the-job car accident. His injuries rendered him unable to perform his previous position and initially made him unable to work in any job. In late April 2011, the City gave him time off in accord with the Family Medical Leave Act (FMLA).

When his FMLA leave expired in July 2011, the City placed Dillard in its Return to Work Program, which helps injured employees find limited duty work or placement in an alternate position for which the employee meets minimum qualifications and can perform the job's essential functions. Typically, the program provides a maximum 180 days of assistance in a year; 90 days in which his department tries to find an internal position, and 90 days in the "Citywide Alternate Placement Process," during which time the employee is considered for reassignment in other departments. Dillard exited the Return to Work Program in January 2012. The City was unable to place Dillard, as he remained on "no duty" status during the entire period he was enrolled in the program. Although Dillard exhausted both FMLA leave and his time limit in the Return to Work Program, the City allowed him to remain on leave.

After exiting the Return to Work Program, Dillard was referred back to his original department, Public Works. Between late January and late April 2012, Dillard was released by his doctors to perform "limited duty" or "administrative duty" work. The City looked for positions within Public Works

2

that Dillard could perform given the limitations imposed by his doctors.  It offered Dillard a temporary position as an administrative assistant.  Dillard testified that he was "stunned a little bit, because [he] didn't know how to do no administrative work."  Despite expressing reservations about whether he could do the job, he accepted it.  Dillard worked in this position from May through October 2012.

Dillard did not meet the listed minimum qualification for an administrative assistant position with the City, as he did not have the minimum three years clerical or secretarial experience.  In light of his lack of experience, Dillard was given on-the-job typing and computer training, and shadowed another administrative assistant.  Dillard's supervisor, Valerie Dickens, testified that she repeatedly told Dillard to complete more training, and showed him how to sign up for the City's training programs, but he did not do so.  His computer and typing skills did not improve.  Instead of working or training, he was found playing computer games and surfing the internet, sleeping, making personal calls, and applying for other positions within the City.  Dickens also testified that Dillard repeatedly missed work without proper notice, came late and left early, and lied about his time.  The City produced evidence that Dillard attended work only 74% of the time over a 21-week period.  As a result of his performance and behavior issues, Dickens gave Dillard an "unsatisfactory" year-end evaluation in September 2012.  Dillard does not dispute these assertions about his performance.

Dillard did testify, however, that he was given almost no work to do, and that he could not finish the one assignment he was given in a timely manner because of his lack of typing skills.  Dillard told Dickens that he was unhappy in the position and asked human resources to give him a different position.  Dickens also asked that he be removed because he did not have needed skills and was "demonstrating no initiative, no desire to learn," but she was told to

keep trying and to document his deficiencies. Dillard also notes that during the time he was working in the administrative position, his doctors provided further releases and a functionality analysis—all of which expanded the list of activities he was cleared to perform, including some lifting and other physical activity.

Following his unsatisfactory review, Dillard was given a pretermination meeting. The Public Works Department Director noted that during this meeting, "Dillard was unapologetic for his inappropriate behavior and admitted that Dickens' comments about his performance were accurate." He reported that the City nonetheless looked for other options and accommodations after the meeting, but was unable to find one.[1] The City fired Dillard on October 26, 2012. His termination letter notes:

> Though you were provided with both on-the-job and computer training during the temporary assignment as an Administrative Assistant, you were unsuccessful performing the duties in the administrative role. . . . As you are currently at "no duty status" and are unable to return to your position as a Street & Drainage Maintenance Senior, and the placement opportunity was unsuccessful, the Department has made the difficult decision to separate you from employment with the City of Austin . . . .

Dillard brought suit in federal court claiming denial of reasonable accommodation and discrimination based on disability in violation of the Americans with Disabilities Act (ADA) and the Texas Commission on Human

---

[1] Dillard asserts that the City's search was inappropriately restricted to the Public Works Department and that he should have been considered for vacancies across all departments once it became clear that he was not performing well as an administrative assistant. The Director's testimony does not specify the scope of the City's search, but, in its brief, the City acknowledged that it looked only within Public Works. We need express no opinion on whether this restriction was consistent with the City's obligation to accommodate Dillard. Our analysis locates the breakdown of the interactive process at the point when Dillard failed to make a good faith effort in the administrative position—a stage prior to when the City purportedly should have continued the interactive process by considering him for other jobs.

No. 15-50779

Rights Act.  The City moved for summary judgment, which the court granted on both claims.

## II

We review a summary judgment ruling de novo.  *Davis v. Fort Bend Cty.*, 765 F.3d 480, 484 (5th Cir. 2014).  We interpret all facts and draw all reasonable inferences in favor of the nonmovant.  *Ion v. Chevron USA, Inc.*, 731 F.3d 379, 389 (5th Cir. 2013).  Summary judgment is appropriate only when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED.R.CIV.P. 56(a).

As Texas courts interpret their state's disability legislation so as to mirror the federal statute, our analysis of Dillard's ADA claims will determine the disposition of his state claims as well.  *See Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 473–74 (5th Cir. 2006) (citing *NME Hosps., Inc. v. Rennels*, 994 S.W.2d 142, 144 (Tex. 1999)).

Dillard alleges both that he was discharged because of his disability and that the City failed to take reasonable measures to accommodate him.  The parties do not contest two of the elements these claims require: whether Dillard was disabled within the meaning of the Act or whether the City was aware of his disability and need for accommodation.  *See Feist v. La., Dep't of Justice, Office of the Att'y. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013) (reviewing these other elements).

## A

We address first Dillard's claim that the City terminated him based on his disability.  The City maintains that it fired Dillard because of his record of misconduct and failure to perform his duties while working as an administrative assistant.  The evidence consistently supports the City's assertions that Dillard was frequently absent or late, that he lied about his attendance, and that he used work time to play games or tend to personal

business. In addition to this evidence of misconduct, it is uncontroverted that Dillard failed to take advantage of training opportunities available to him, failed to perform the duties of his assigned position, and in the words of his supervisor, he "demonstrat[ed] no initiative, no desire to learn" in his new role.

As with other federal statutes proscribing workplace discrimination, the ADA places the initial burden on a plaintiff trying to prove a violation through circumstantial evidence to offer evidence that his termination was motivated by an unlawful factor. *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014). Once the defendant articulates a nondiscriminatory reason for its decision, as the City has done here, the onus returns to the plaintiff, who must then bear the ultimate burden of proving that his dismissal was motivated by his disability. *Id.* at 702. Significantly, Dillard offered no evidence that the City's reliance on his history of misconduct and poor performance was pretextual or blended with discriminatory motives. *See id.* (approving either form of proof). As such, the district court correctly held that Dillard failed to raise an issue of material fact as to whether the City terminated him because of his disability. *See id.* at 701–02 ("Terminating an employee whose performance is unsatisfactory according to management's business judgment is legitimate and nondiscriminatory as a matter of law.").

**B.**

Apart from any claim that an adverse employment action was motivated by the employee's disability, an employer's failure to reasonably accommodate a disabled employee may constitute a distinct violation of the Act. *Id.* at 703 n.6. This comes from the ADA's definition of discrimination, which includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee . . . ." 42 U.S.C. § 12112(b)(5)(A).

No. 15-50779

When it entered summary judgment on this reasonable accommodation claim, the trial court reasoned that the City could have fired Dillard once he exhausted his leave under federal law and city policy in January of 2012—a time when he had not been medically cleared for work of any kind. *See Reed v. Petroleum Helicopters, Inc.*, 218 F.3d 477, 481 (5th Cir. 2000) (holding that an employer need not accommodate with indefinite leave an employee who is unable to return to work in any role). The district court concluded that the City's obligation to reasonably accommodate Dillard ceased at that time.

We disagree.[2] Regardless of whether it could have discharged Dillard when his leave ran out, the City chose not to do so. Rather, it kept him on staff until it learned he was approved by his doctor for "limited duty" and placed him in the administrative assistant position. Because it continued to employ him, the City was obligated under the ADA to reasonably accommodate him once he was capable of returning to work. This follows from the principle that an employer's obligation to accommodate is triggered when an employee requests an accommodation. *See Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 165 (5th Cir. 1996). Nothing in the Act extinguishes that obligation merely because an employer had a basis for getting rid of the employee in the past.

What does the obligation to accommodate entail? Consistent with the interpretive guidance of the EEOC, 29 C.F.R. pt. 1630, app. § 1630.9, we have held that ADA compliance requires an employer to engage in an interactive process with an employee who requests an accommodation for her disability to ascertain what changes could allow her to continue working. *LHC Grp.*, 773

---

[2] This of course does not decide the outcome of this appeal since we may affirm a summary judgment on any ground supported by the record and advanced below, regardless of whether the district court relied upon it. *Ballard v. Devon Energy Prod. Co.*, 678 F.3d 360, 365 (5th Cir. 2012).

7

F.3d at 700.  In other words, employer and employee must work together in good faith, back and forth, to find a reasonable accommodation.  *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621–22 (5th Cir. 2009).  This should be an ongoing, reciprocal process, not one that ends with "the first attempt at accommodation," but one that "continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed." *Humphrey v. Memorial Hosps. Ass'n*, 239 F.3d 1128, 1138 (9th Cir. 2001).

Dillard argues that the City failed to participate in the interactive process after it became clear he was not succeeding in the administrative position.  Notably, he does not contend that his initial placement in that position was itself a failure to reasonably accommodate.  He thus directs our attention to the record evidence showing that the City soon saw that the job was a poor fit for him as he lacked the skills and qualifications to do the work he was given.  He also relies on evidence that his doctor steadily reported his improved condition and restored capacities during the months he worked as an assistant.  In light of his improving condition, Dillard contends that the City should have considered him for alternative placements (identifying several vacancies he asserts he could have filled as his mobility improved) and that the City's failure to do so violated its duty to work with him in good faith to find a reasonable accommodation.

Dillard's position neglects that the interactive process is a two-way street; it requires that employer and employee work together, in good faith, to ascertain a reasonable accommodation.  *Chevron*, 570 F.3d at 621–22.  The City offered Dillard the administrative assistant position, and while he doubted his ability to do it, he accepted it.  At this point, the ball was in his court: it was up to him to make an honest effort to learn and carry out the duties of his new job with the help of the training the City offered him.  The same uncontroverted

evidence of misconduct and poor performance that doomed Dillard's discriminatory termination claim is thus also decisive for his reasonable accommodation claim.  We stress the evidence of misconduct (making personal calls, nonattendance, napping, lying, playing games) because even an employee unable to perform office tasks needs no special skill to avoid misusing company time, dishonesty, falling asleep, or absenteeism.  As he did not attempt to fill his new role in good faith, Dillard cannot rely on the fact that he did not successfully adjust to that role to show that the City should have continued the interactive process by offering him a further alternative placement.  *See Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 (5th Cir. 1999) ("[A]n employer cannot be found to have violated the ADA when responsibility for the breakdown of the 'informal, interactive process' is traceable to the employee and not the employer.").

We are mindful that an employer might elude its obligation to accommodate a disabled employee by giving him a job that he was destined to botch with or without training.  *Cf. id.* at 737 n.6 (describing how an employer might leave an employee needing accommodations in his current position, enumerate his deficiencies, and use its list as a basis for terminating him).  Such predictable failure could be traceable to the worker's want of skills or the demoralizing effects of failure and appearing inept.

This case, however, does not present such a scenario.  The City offered to make Dillard an assistant and he accepted.  Dillard does not contend that the initial job assignment was an unreasonable accommodation.  And once Dillard started the new position, the City provided training to help him gain necessary skills and gave him the opportunity of shadowing an experienced assistant.  We thus do not see a basis for concluding that the City failed to engage in good faith by not finding him a new position after he had shown no desire to try and succeed in the first position.  *See EEOC. v. Agro Distribution,*

9

No. 15-50779

*LLC*, 555 F.3d 462, 471 (5th Cir. 2009) ("The ADA provides a right to reasonable accommodation, not to the employee's preferred accommodation."). Given the undisputed evidence that Dillard did not make an honest attempt to succeed in the new position, he cannot make out a claim placing blame for the breakdown in the accommodation process on the City.

* * *

The judgment is AFFIRMED.