# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-60649

WILLARD HEAD,

Plaintiff - Appellant

v.

CITY OF COLUMBUS LIGHT AND WATER DEPARTMENT,

Defendant - Appellee

United States Court of Appeals
Fifth Circuit

**FILED**
September 4, 2018

Lyle W. Cayce
Clerk

Appeal from the United States District Court
for the Northern District of Mississippi
USDC No. 1:16-CV-77

Before SMITH, CLEMENT, and COSTA, Circuit Judges.

PER CURIAM:[*]

Plaintiff-Appellant Willard Head appeals the district court's grant of summary judgment in favor of Defendant-Appellee City of Columbus Light and Water Department ("CLWD") on his claim for disability discrimination under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101. For the reasons set forth below, we AFFIRM.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 17-60649

**I**

In 1992, Head was involved in an automobile accident while driving a truck for his former employer and required a right hip replacement. Unable to continue his employment as a result of his injuries, Head enrolled in community college and ultimately received a job as a "mapper" at CWLD in 1995. Head's duties as a mapper included maintaining and updating the computerized map of the city's electric system. He was also responsible for dispatching trucks in response to power outage calls. In his CWLD employment application, Head noted that he had "physical defects which preclude [him] from performing certain types of work," specifically, "hip replacement, no heavy lifting."

Head was directly supervised by Chief Engineer Rusty Jaudon, with whom he shared an office space for nearly 19 years. Jaudon reported to Superintendent C.F. Harris until April 2014, when Harris retired and was succeeded by Marcus Rushing. Head and Jaudon had a strained personal relationship throughout Head's tenure at CWLD. Specifically, Head complained that Jaudon gave him too many additional duties, which distracted him from his job as a mapper. According to Head, on some occasions, Jaudon required him to do physical work that he was unable to perform. He references one specific occasion in which he complained to Jaudon that he was unable to climb a ladder to post pole numbers on electrical poles. Harris confirmed that Head was sometimes sent into the field to get contracts signed for security lighting projects and perform some minor jobs that required minimal physical exertion.

In September 2013, CWLD General Manager Todd Gale found Head asleep at his desk, and reported that he was acting disoriented and slurring his speech. Harris testified that, at some point, Head appeared to "just kind of lose focus." Head was on multiple heavy medications—some related to his 1992

2

hip injury—and Harris testified that there were "some issues with me smelling alcohol on him." Harris advised Head not to leave CWLD property in any of the department vehicles for some time as a result of his concerns. Head was warned that his behavior could lead to disciplinary action, and he apparently requested that his doctor taper him off of painkillers and Xanax. Harris also testified that Jaudon showed him multiple errors in Head's work that ultimately had to be redone several times.

Head's performance issues continued after Rushing succeeded Harris in April 2014. On May 30, 2014, Head was issued a verbal warning after he forgot to pass along an electrical outage call to the regular dispatcher, resulting in a four hour delay on the service request. Only a few days later, on June 5, Head received a written warning for failing to follow instructions and making several errors in updating the transformer database. On September 8, 2014, Head was suspended for arriving an hour and a half late for work and being unable to remember what clients had said on several service calls he received that day.

Head was ultimately terminated on October 10, 2014, after Jaudon discovered that roughly 20% of a group of 164 "staking sheets" updates he was reviewing contained errors. As part of his mapping responsibilities, Head was charged with making changes to the electrical map according to "staking sheets," which note items that need to be added to, replaced, or removed on the master map. Head filed a discrimination claim with the Equal Employment Opportunity Commission and received a right-to-sue letter. He filed suit in the district court alleging that he was terminated on the basis of his age and disability in violation of the ADA and the Age Discrimination in Employment Act ("ADEA"). On appeal, Head abandons his ADEA claim and his ADA accommodation claim, but contends that the district court erred in granting summary judgment on his ADA discrimination claim because there is a

genuine issue of material fact as to whether Head was discharged on the basis of his disability.

## II

This court reviews a grant of summary judgment *de novo*, applying the same standard as the district court. *Rogers v. Bromac Title Servs., L.L.C.*, 755 F.3d 347, 350 (5th Cir. 2014). "Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P. 56(a)). We construe "all facts and inferences in the light most favorable to the nonmoving party," *Dillon v. Rogers,* 596 F.3d 260, 266 (5th Cir. 2010) (citation omitted); but, "[s]ummary judgment may not be thwarted by conclusional allegations, unsupported assertions, or presentation of only a scintilla of evidence." *McFaul v. Valenzuela,* 684 F.3d 564, 571 (5th Cir. 2012).

## III

The ADA prohibits "discriminat[ion] against a qualified individual on the basis of a disability in regard to . . . the hiring, advancement, or discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Head does not provide any direct evidence in support of his disability discrimination claim. Accordingly, we apply the burden shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), to determine whether Head's circumstantial evidence can sustain his ADA claim. *See E.E.O.C. v. LHC Group, Inc.*, 773 F.3d 688, 694 (5th Cir. 2014). The analysis requires Head to establish a *prima facie* case of discrimination. *See E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 615 (5th Cir. 2009). If Head establishes a *prima facie* case, the burden shifts to CWLD to articulate a legitimate, nondiscriminatory reason for discharging Head. *See id*. The burden then shifts back to Head to demonstrate that CWLD's proffered reason is pretextual. *See id*.

No. 17-60649

To establish a *prima facie* case of discrimination, Head must demonstrate "(1) that he has a disability; (2) that he was qualified for the job; [and] (3) that he was subject to an adverse employment decision on account of his disability." *E.E.O.C. v. LHC Group, Inc.*, 773 F.3d 688, 697 (5th Cir. 2014) (quoting *Zenor v. El Paso Healthcare Sys., Ltd.*, 176 F.3d 847, 853 (5th Cir. 1999)). As the district court explained, Head has not demonstrated that his termination was at all motivated by his disability. Head references a specific incident in which he complained to Jaudon about his inability to climb a ladder, but he does not provide any evidence that this incident was related to his termination. Indeed, the evidence in the record demonstrates that CWLD had an issue with Head's performance of his designated mapping duties and his general lack of focus—not his inability to perform ancillary physical tasks.

Even if Head had made a preliminary showing that he was discharged on account of his disability, he has failed to present "'substantial evidence' that [CWLD's] legitimate, nondiscriminatory reason for termination is pretextual." *Delaval v. PTech Drilling Tubulars, L.L.C*, 824 F.3d 476, 480 (5th Cir. 2016) (quoting *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 233 (5th Cir. 2015)). Head "may establish pretext either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'" *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003) (quoting *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 220 (5th Cir. 2001). Head has demonstrated neither.

First, Head has not alleged that he was treated differently from any other employee in his position; he claims only that was treated unfairly as a general matter. Moreover, the record amply supports that CWLD had many issues with Head's job performance—several of which were documented and signed by Head himself. And the issues were reported by multiple complainants. Even former Superintendent Harris, whom Head admits he

5

No. 17-60649

respected and who was invested in Harris's employment, testified that Head had lost focus, was making multiple errors, and smelled of alcohol on more than one occasion. In short, CWLD has articulated legitimate, nondiscriminatory reasons for Head's termination, and Head has provided no evidence that those reasons were false or "unworthy of credence." *Wallace*, 271 F.3d at 220.

## IV

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment.