**WEST INDIA INDUSTRIES, INC.,**
**Plaintiff-Appellant,**

v.

**TRADEX, TRADEX PETROLEUM SERVICES, et al.,**
**Defendants-Appellees.**

No. 80–1896.

United States Court of Appeals,
Fifth Circuit.

Dec. 28, 1981.

Rehearing Denied Feb. 1, 1982.

Robert M. Julian, Houston, Tex., for plaintiff-appellant.

Perkins, Oden, Warburton, McNeill & Adami, J. G. Adami, Jr., Alice, Tex., William C. Bullard, Houston, Tex., for defendants-appellees.

Before GEE and RUBIN, Circuit Judges, and SPEARS *, District Judge.

---

* District Judge of the Western District of Texas, sitting by designation.

ALVIN B. RUBIN, Circuit Judge:

West India Industries, Inc. ("West India") carried aboard its ship M/V INAGUA SURF a cargo of used oil well equipment from Maracaibo, Venezuela, to New Orleans, Louisiana, for the account of Tradex. The sole issue in this appeal is the amount of freight to be paid to West India. We conclude that the district court correctly held that the bill of lading set forth the agreement between the parties and affirm the judgment denying West India recovery for a sum greater than the amount specified in the bill of lading.

## I

David Howell, who does business under various trade names including Tradex, obtained an option to buy used oil well equipment in Venezuela from Perforaciones Delta, C.A., a Venezuelan subsidiary of Delta Drilling Company. He proposed to ship the equipment to the United States for resale. After obtaining this option, he assigned a two-thirds interest in the equipment to Arnold Wiederkehr, a Texas resident who is in the oil business.

During the late summer or early fall of 1978, Tradex began negotiations with West India, a company engaged in the ocean carriage of freight, to transport the equipment from Venezuela to the United States. On October 23, 1978, Hubert Colburn, who was employed in West India's Houston office, sent Tradex a letter confirming their oral agreement whereby West India had booked a shipment by Tradex of oil well equipment from Maracaibo, stating that "[t]he rate applying is $64.00 per 2000 pounds or 40 cubic feet, whichever basis yields the greater revenue to the vessel." On October 26, Howell signed and returned to West India a copy of this letter, and thereby "agreed to and accepted" its terms.

Wiederkehr and his agent, Travis Vollmering, went to Maracaibo early in October 1978 to make final arrangements for the delivery of the equipment. They negotiated with Jose Brisino,[1] an employee of Tau-

---

1. This is the spelling Vollmering gave when he testified at trial. In the briefs and elsewhere

rel & Co. ("Taurel"), West India's general agent in Maracaibo, for shipment of the equipment. There is no evidence that they knew of the negotiations between. Howell and Colburn; and Wiederkehr and Vollmering both testified that, when they were dealing with Brisino, they knew nothing about the October agreement. Brisino proposed to transport the cargo for $64 per weight ton. Vollmering and Brisino orally agreed to this figure.

At Brisino's request, the weights and measurements of the various pieces of equipment were given to him. Taurel then communicated these weights and measurements by telex to West India's home office in West Palm Beach, Florida.

The INAGUA SURF arrived at the port of Maracaibo on October 28. After the equipment was loaded onto it, Taurel prepared three original bills of lading. These showed that the shipper was Perforaciones Delta and the consignee was Tradex-David Howell. They listed the quantity, type, and weight of the equipment and showed the total vessel freight as $44,800, calculated on the basis of $64 per ton for 700 tons of freight. Although West India says in its brief that "someone in Venezuela, without authority from West India inserted the sum of $44,800.00 as the freight amount," it cites only the trial court's findings for this. The trial court found instead, with ample record support, that the freight calculations "originated" in West India's West Palm Beach office and were sent by telex to Taurel in Venezuela.

All three original bills of lading were signed and sealed by John Hurlston, master of the INAGUA SURF. However, West India sent Taurel a telex message "directing [that] the original bill of lading not be delivered until such time as the freight had been paid in full." Accordingly, when the vessel sailed, the three original bills of lading were sent by courier to West India's West Palm Beach office.

Taurel gave a photocopy of the bill of lading to Perforaciones Delta. Its representative in turn handed the photocopy to

Vollmering in Maracaibo. Vollmering and Wiederkehr then returned to the United States where, in reliance on the amount of freight due as shown on their copy, he and Vollmering began final negotiations to finance the purchase and transportation of the equipment. Title was, of course, still in Perforaciones Delta, which had not yet been paid. Vollmering testified that he and Wiederkehr also relied on the amount of freight due as shown on their copy by forgoing possible shipping arrangements with other carriers.

There was testimony that the only distinction between original bills of lading and copies is that the copies are nonnegotiable. Copies of the bill of lading are customarily delivered to the shipper of the cargo; they are used and relied upon for securing export licenses, for banking arrangements, and for other business transactions. There was further testimony that the primary difference between an original bill of lading and a copy is that the original allows a person to transfer title to the freight.

After the original bills of lading reached West India's Florida office, employees there noticed that the freight had been calculated on a "weight" basis instead of on a "volume" basis. The "volume" basis would have yielded greater revenue to the vessel. Recalculation of the freight on a "volume" basis resulted in an upward revision of the charge to $122,854.40. Accordingly, West India's employees altered the original bills of lading by blacking out the $44,800 freight amount. After the equipment was unloaded in New Orleans, it was remeasured and reweighed, and the $122,854.40 figure was reduced to $108,000. West India claims that it is due $108,000 plus an insurance premium, less $45,000 already paid to it.

The preamble to the bill of lading states: "It is agreed that the custody and carriage of the goods are subject to the following terms on the face or back [of the bill of lading] which shall govern the relations, whatsoever they may be, between the ship-

this name is spelled "Bresenio" and "Breciene- ro."

per, consignee, and the Carrier, Master and ship in every contingency, wheresoever and whensoever occurring . . . ."[2] One of these "following terms," ¶ 27, provides: "All agreements or freight engagements for the shipment of the goods are superseded by this bill of lading . . . ." The district court concluded that the bills of lading, "as they were signed and sealed and before they were altered, represent[ed] the controlling agreement between the parties" and that the bills of lading "superseded any prior agreement between the parties." West India takes exception to this conclusion.

## II

A bill of lading is an acknowledgment by a carrier that it has received goods for shipment. G. Gilmore & C. Black, The Law of Admiralty § 3–1, at 93 (2d ed. 1975); 1 T. Parsons, A Treatise on the Law of Shipping and the Law and Practice of Admiralty 190 (Boston 1869). The bill of lading is also a contract of carriage. G. Gilmore & C. Black, *supra*, § 3–1, at 93; 1 T. Parsons, *supra*, at 190; *see Baker Oil Tools, Inc. v. Delta S. S. Lines, Inc.*, 562 F.2d 938, 940 (5th Cir. 1977), *modified per curiam on other grounds*, 571 F.2d 978 (5th Cir. 1978); *Cabot Corp. v. S. S. Mormascan*, 441 F.2d

476, 478 (2d Cir.), *cert. denied*, 404 U.S. 855, 92 S.Ct. 104, 30 L.Ed.2d 96 (1971). It serves this function whether negotiable or not. *See* G. Gilmore & C. Black, *supra*, § 3–1, at 93. In addition, "if the bill is negotiable (as, for all practical purposes, all ocean bills are) it controls possession of the goods and is one of the indispensable documents in financing the movement of commodities and merchandise throughout the world." *Id.* (footnote omitted).

We need not expatiate on the effect of the October letter between Colburn and Howell. Even if, as West India argues, it was a contract,[3] it was nevertheless superseded by the bill of lading. *Universal Am. Corp. v. S.S. Hoegh Drake*, 264 F.Supp. 747, 751–52 (S.D.N.Y.1966); *Armour & Co. v. Leopold Walford (London), Ltd.*, [1921] 3 K.B. 473, 474, 475–76; H. Longley, Common Carriage of Cargo § 3.04[3], at 23 (1967).

West India seems to argue that, if the October 26 letter was a contract, it was thereafter immutable. To state this proposition baldly is to expose its error. Be a contract ever so binding, it is but a meeting of the minds, and those who enter into a contract may by mutual agreement rescind or alter it.[4] Parties may, therefore, after

---

**2.** *Cf. Son Shipping Co. v. De Fosse & Tanghe*, 199 F.2d 687, 688 (2d Cir. 1952) (noting that a similarly worded incorporation clause in a bill of lading was written in "language so plain that its meaning is unmistakable").

**3.** In one of the parts of his deposition that were read into evidence, David Howell said that "the so-called agreement with West India"—that is, the October letter—"was tentative." Our disposition of this case, however, makes it unnecessary for us to elaborate on the possibility that the October letter between Colburn and Howell was "a preliminary memorandum only, and not a final and definite statement of all the terms of the agreement between the parties." *The Caledonia*, 43 F. 681, 685 (1st Cir. 1890), *aff'd*, 157 U.S. 124, 137, 15 S.Ct. 537, 543, 39 L.Ed. 644, 648 (1895); *accord, The Henry S. Grove*, 292 F. 502 (D.Wash.1923).

> In the instant case the only agreement [preceding the bill of lading] is to ship the cargo for a stated compensation. There are no limitations of any sort, not even perils of the sea excepted. It is apparent . . ., from the entire record, that the bill of lading was understood by all of the parties as intending to

> express the real contract by which the mutual obligations of the parties were to be governed.

*Id.* at 504. The pre-bill of lading agreement at issue in *The Henry S. Grove* was a confirmation letter similar to the October letter at issue in this case. *Id.* at 502–03.

**4.** "Any contract, however made or evidenced, can be discharged or modified by subsequent agreement of the parties." 3 A. Corbin, Corbin on Contracts § 574, at 371 (1960), *quoted in Carolina Metal Prods. Corp. v. Larson*, 389 F.2d 490, 494 (5th Cir. 1968); *accord, Stauffer Chem. Co. v. Brunson*, 380 F.2d 174, 182 (5th Cir. 1967) (admiralty action) ("alteration, modification or waiver of contract provisions"); *Fontainbleau Hotel Corp. v. Crossman*, 323 F.2d 937, 942 (5th Cir. 1963); *Wiener v. Compagnie Generale Transatlantique*, 61 F.2d 893, 895 (2d Cir. 1932) (A. Hand, J.) ("Even a provision that there shall be no modification of an existing contract may be revoked by a new agreement between the parties which contradicts it."); Restatement (Second) of Contracts § 279 (1979).

they have formed a contract for carriage, assent to different terms contained in a bill of lading, and "thereby ma[k]e a new and different contract." *Northern Pac. Ry. v. American Trading Co.*, 195 U.S. 439, 463, 25 S.Ct. 84, 92, 49 L.Ed. 269, 279 (1904).[5]

 In its brief, West India asserts that the bill of lading cannot thus replace the contract contained in the October letter between Colburn and Howell because the bill of lading is "not supported by any consideration or mutuality." *See* 3 A. Corbin, *supra*, § 574, at 371 n.12 ("antecedent agreements are not discharged by a later agreement that is void for lack of consideration"); L. Simpson, Handbook of the Law of Contracts § 58, at 101 (2d ed. 1965). This assertion, however, is groundless. The bill of lading does not merely grant Tradex a lower shipping rate, and otherwise duplicate the terms of the October letter. Rather, the bill of lading contains numerous additional terms, conditions, and require-

ments applicable to both West India and Tradex. Thus we find that, by entering into the contract embodied in the bill of lading, Tradex at least "assumed even a slight additional duty" in exchange for the lower shipping charge; therefore, that contract is supported by consideration. J. Calamari & J. Perillo, The Law of Contracts § 4–8, at 146 (1977).[6]

 West India argues that the papers that were called bills of lading were not those in legal effect because the originals were never delivered. But West India and Tradex never conditioned the validity of the freight contract on the delivery of either an original copy or a photocopy of the contract. "All that is necessary . . . is an expression of assent in any form. . . . [E]ven if [the contract is] in writing and signed, a delivery is not necessary. It is an expression of assent that is required." 1 A. Corbin, *supra*, § 32, at 125 (1963).[7]

---

**5.** [A]ny contradiction between the [earlier agreements] and the bills of lading must be resolved in favor of the former, unless it is clear that the parties did, as a matter of fact, intend the bills of lading to constitute a new contract, entirely superseding the earlier oral and written agreements.

*Toyo Kisen Kaisha v. W. R. Grace & Co.*, 53 F.2d 740, 743 (9th Cir. 1931); *see Nichimen Co. v. M. V. Farland*, 462 F.2d 319, 328 n.4 (2d Cir. 1972) (citing and quoting cases); *Transmarine Corp. v. Charles H. Levitt & Co.*, 25 F.2d 275, 277 (2d Cir. 1928) (L. Hand, J.); *Equi Valley Marble Co. v. Becker*, 165 F. 437, 438 (2d Cir. 1908), *aff'g* 153 F. 378, 380 (S.D.N.Y.1907); *American Tobacco Co. v. The Katingo Hadjipatera*, 81 F.Supp. 438, 447–48 (S.D.N.Y.1948), *modified and aff'd*, 194 F.2d 449 (2d Cir. 1951), *cert. denied*, 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370 (1952); *United States v. Fisher Flouring Mills Co.*, 295 F. 691, 692–93 (W.D. Wash.1924); *The Chadwicke*, 29 F. 521, 524 (S.D.N.Y.1887); *Armour & Co. v. Leopold Walford (London), Ltd.*, [1921] 3 K.B. at 477; W. Poor, American Law of Charter Parties and Ocean Bills of Lading § 59 (5th ed. 1968).

**6.** [I]f the bargained-for performance rendered by the promisee includes something that is not within the requirements of the pre-existing duty, the law of consideration is satisfied. It makes no difference that the agreed consideration consists almost wholly of a performance that is already required and that this performance is the main object of the promisor's desire. It is enough that some

small additional performance is bargained for and given.

1A A. Corbin, *supra*, § 192, at 180 (1963); *accord, id.* at 182 ("the giving of something different from what was previously due, even though of slight value"); *see American Smelting & Ref. Co. v. Naviera Andes Peruana, S. A.*, 208 F.Supp. 164, 169 (N.D.Cal.1962) (shipping company made concessions for which other party "ha[d] given no new consideration"), *aff'd*, 327 F.2d 581 (9th Cir. 1964); *cf. Missouri, Kan., & Tex. Ry. v. Ward*, 244 U.S. 383, 386, 37 S.Ct. 617, 619, 61 L.Ed. 1213, 1215 (1917) (Brandeis, J.) ("As appellants were already bound [by statute] to transport the [goods] at the rate and upon the terms named in the original bill of lading, the acceptance by the shipper of the second bill was without consideration and was void.").

We note also, but need not elaborate on, the possibility that even if the agreement embodied in the bill of lading lacked consideration, it nevertheless could be enforced against West India because Wiederkehr and Vollmering acted in reliance on it. *See, e. g., FMC Fin. Corp. v. Reed*, 592 F.2d 238, 243 (5th Cir. 1979); Restatement (Second) of Contracts § 90 (1979). Presumably West India, which in its brief stresses the importance of its own reliance on the October agreement between Howell and Colburn, would accept the premise for such an argument.

**7.** *Accord, e. g., Osguthorpe v. Anschutz Land & Livestock Co.*, 456 F.2d 996, 1000 (10th Cir.

Furthermore, we are not dealing here with copies obtained by deceit or chicanery. A photocopy was handed to the shipper by West India's agent. This is enough to constitute a delivery. West India's own witnesses testified that the only distinction between an original bill of lading and a copy is that the original is negotiable, and it allows for the transfer of title to the freight. They also testified that the only reason the original bills of lading were not delivered was because the freight had not been prepaid. The original bills of lading were withheld as security for the payment of freight, not because the agreement was uncertain or contingent. When the copy was delivered, it was evidence of the contract. 1 A. Corbin, *supra*, § 32, at 126 ("delivery of a writing may be sufficient evidence of . . . assent").

■ There is no greater merit to West India's contention that its agents lacked authority to change the letter agreement of October 26, 1978. The evidence supports the district court's finding that both Taurel and its employee Brisino were authorized to prepare and issue bills of lading on behalf of West India, and that the bills of lading at issue in this case were prepared and executed in accordance with that authority. *Cf. Northern Pac. Ry. v. American Trading Co.*, 195 U.S. at 463, 25 S.Ct. at 92, 49 L.Ed. at 279 ("the mere reception of [a] bill of lading by a clerk . . . without evidence of any authority in him to consent to a modification of the contract already made by his employer"). West India, therefore, is bound by the contract embodied in the bill of lading. *E. g., Sun Oil Co. v. Behring Properties, Inc.*, 480 F.2d 310, 314 (5th Cir.), *cert. denied*, 414 U.S. 1039, 94 S.Ct. 539, 38 L.Ed.2d 329 (1973); W. Seavey, Handbook of the Law of Agency §§ 55–56 (1964).

■ Finally, West India urges that there was mutual mistake in the bills of lading. This issue was neither pleaded nor urged in the district court; and "absent some manifest injustice," we do not consider afterthoughts first raised on appeal. *Empire Life Ins. Co. of Am. v. Valdak Corp.*, 468 F.2d 330, 334 (5th Cir. 1972).[8] Moreover, the facts show that the bills of lading were not only prepared by West India[9] but reflected both the negotiations between Brisino and Vollmering and "the understanding of the parties." *Hellenic Lines, Ltd. v. United States*, 512 F.2d 1196,

1972) ("delivery is not necessary in the absence of an express intention"); *Armour & Co. v. Celic*, 294 F.2d 432, 435 (2d Cir. 1961) ("In the absence of some requirement in the contract itself, we know of no principle of law which makes the validity of a contract contingent upon its delivery or the delivery of a copy to one or more of the parties to it."). *But see, e. g., Garcia v. Villarreal*, 478 S.W.2d 830, 832–33 (Tex.Civ.App.1971).

8. "The very nature of an appellate system precludes litigants from raising issues for the first time on appeal." *Donovan v. Hamm's Drive Inn*, 661 F.2d 316, 317 (5th Cir. 1981); *accord, United States v. Lacy*, 658 F.2d 396, 397 (5th Cir. 1981) (per curiam); *McWilliams v. Escambia County School Bd.*, 658 F.2d 326, 335 n.5 (5th Cir. 1981); *Seminole Tribe v. Butterworth*, 658 F.2d 310, 316 (5th Cir. 1981); *United States v. Unum, Inc.*, 658 F.2d 300, 305 (5th Cir. 1981).

9. Courts construe a bill of lading strictly against the party that drafted it. *The Caledonia*, 157 U.S. 124, 137, 15 S.Ct. 537, 543, 39 L.Ed. 644, 648 (1895) ("As the exceptions [in the bill of lading] were introduced by the shipowners themselves in their own favor, they are to be construed most strongly against them . . . ."); *Mitsui & Co. v. American Export Lines, Inc.*, 636 F.2d 807, 822–23 (2d Cir. 1981) ("ocean bills of lading are contracts of adhesion ambiguities in which must be resolved against the carrier"); *Toyo Kisen Kaisha v. W. R. Grace & Co.*, 53 F.2d at 744 ("a bill of lading is to be construed strictly against the carrier"); *E. Gerli & Co. v. Cunard S.S. Co.*, 48 F.2d 115, 116 (2d Cir. 1931) (L. Hand, J.) ("the language of a bill of lading must be taken against the carrier"); *Baltimore & O.R.R. v. Doyle*, 142 F. 669, 673 (3d Cir. 1906) ("Any reasonable doubt as to the proper interpretation of the contract should be resolved against the [carrier]. It chose the language incorporated in the printed portions of the bill of lading."); *see Tessler Bros. (B. C.) Ltd. v. Italpacific Line*, 494 F.2d 438, 444–45 (9th Cir. 1974); *Encyclopaedia Britannica, Inc. v. SS Hong Kong Producer*, 422 F.2d 7, 15 (2d Cir. 1969), *cert. denied*, 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970); *cf. United States v. Strickland Transp. Co.*, 200 F.2d 234, 235 (5th Cir. 1952) ("if it could be considered that there is an ambiguity in the tariff and it is not made clear under which rating the articles shipped come, the ambiguity must be resolved in favor of the shipper").

952

1209 (2d Cir. 1975). If persons in West India's Florida office erred in acting on this agreement, their error was a unilateral mistake insufficient to warrant setting the contract aside. *See Lee v. Hunt*, 631 F.2d 1171, 1177 (5th Cir. 1980); *Anderson Bros. v. O'Meara*, 306 F.2d 672, 675–77 (5th Cir. 1962). *See generally* J. Calamari & J. Perillo, *supra*, §§ 9–26, –27; Restatement (Second) of Contracts §§ 151–158 (1979).

For these reasons, the judgment is AFFIRMED.