# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

No. 15-20018

_____

JACLYN R. JURACH,

     Plaintiff-Appellant

v.

SAFETY VISION, LLC,

     Defendant-Appellee

United States Court of Appeals
Fifth Circuit

**FILED**

March 15, 2016

Lyle W. Cayce
Clerk

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:14-CV-44

_____

Before DENNIS and COSTA, Circuit Judges, and ENGELHARDT, District Judge.[*]

KURT D. ENGELHARDT, District Judge: [**]

Jaclyn Jurach ("Jurach") sued her former employer, Safety Vision, LLC ("Safety Vision" or "the Company"), in state court for disability discrimination, failure to accommodate, and retaliatory discharge, all under the Texas Commission on Human Rights Act ("TCHRA"), section 21.001 *et seq.* of the

_____

[*]     District Judge of the Eastern District of Louisiana, sitting by designation.

[**]     Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 15-20018

Texas Labor Code. Safety Vision removed the action, before prevailing on summary judgment before the district court. Jurach appeals. We affirm.

## BACKGROUND

Jurach worked at Safety Vision for nearly five years, from January 2006, until her termination on October 14, 2010. For the duration of her employment, Jurach was disabled, and she remains so today. Jurach's disability relates to ailments in both eyes. Prior to her tenure at Safety Vision, Jurach experienced a detached retina in her left eye. Then, in early 2010, Jurach underwent surgery for a similar medical issue in her right eye. Complications from the 2010 surgery left Jurach suffering from mydriasis, a condition involving the permanent dilation of the pupil. As a result of the condition of her eyes, Jurach experienced headaches, varying in degree of severity, as early as the first month of her employment at Safety Vision. However, only over time did she realize that fluorescent lighting incited the headaches.

When she first began at Safety Vision, Jurach worked on the second floor of her employer's two-story office building in a cubicle with fluorescent lights overhead. At that time, only months removed from what would be the first of two eye surgeries, she was unaware that fluorescent light was the culprit of her "worst pain." However, Jurach did communicate to her supervisor that she was having difficulty seeing her computer screen. Safety Vision, in response, provided Jurach with a larger monitor, which she found to be helpful. Then, still in the first year of her employment, Jurach took a personal leave of absence in late July of 2006 that lasted roughly three months. When she returned, Jurach was assigned to a different cubicle and given a monitor equally as large as the one she had before. Although still located in the proximity of fluorescent lights, this second cubicle had the advantage of

natural light from an adjacent window. By this time, Jurach had become aware that fluorescent light aggravated the headaches she continued to suffer. However, she never requested any of the fluorescent rods in the ceiling be disengaged. Instead, Jurach attempted to reduce exposure to them by positioning herself facing the wall, such that all of the fluorescent lights were located behind her. Despite the presence of natural light from the adjacent window, and Jurach's efforts to shield herself, Jurach's headaches continued.

For personnel reasons extraneous to the instant matter, Safety Vision moved Jurach in late 2007 to a windowless interior office that she would share with an engineer. While this office was also lit by overhead fluorescent lights, Jurach enlisted coworkers to help her disengage the fluorescent rods over her area of the shared office. Despite experiencing more pain in the shared office than she had in the cubicle before, Jurach admits that, to this point, she had never asked for an accommodation other than the large computer monitor.

In September of 2008, after Jurach had spent nearly a year assigned to the shared office, Safety Vision rearranged personnel and moved Jurach to a private office that also had overhead fluorescent lighting and no windows. Jurach, again, disengaged some but not all fluorescent rods in this private office. Often, she turned off those lights that remained overhead and, instead, worked by the light of a lamp that she had brought from home. Although the headaches continued, Jurach described the private office as the best workspace she ever had at Safety Vision.

In late 2008 or early 2009, after she had moved into the private office, Jurach made her first request connected to fluorescent-light sensitivity, when she asked then-Marketing Director, Teresa Phillips, for a private office with a window. Jurach would later request a windowed office from Engineering Director, Chris Fritz, in or about February 2009, as well as Human Resource

Director, Vicki Hammett, around the same time. She was informed on each occasion that none was available.

A year later, when Jurach underwent surgery in February, 2010, she was allowed a month-long medical leave of absence to recuperate. As previously noted, this 2010 surgery resulted in optical nerve damage that left Jurach suffering from mydriasis. Upon her return to work in March of that year, Jurach found that she had an increased sensitivity to florescent light, and, three weeks later, she emailed a request for a windowed office to Chief Operations Officer, Lawrence Rominger ("Rominger"), stating that artificial light was "hard on her eyes." Rominger responded, on April 19, that Safety Vision was formulating plans to relocate Jurach and the Marketing Department, and that he would pay attention to her "situation." Jurach, in reply, expressed a need for a quiet space to review contracts and complete other tasks made difficult by distractions. At her deposition, Jurach admitted that Rominger's promise to consider her request in the relocation was "reasonable" at the time.

Safety Vision relocated Jurach and the Marketing Department five months later, at the beginning of September, 2010. In the days preceding the move, Jurach learned that she was destined for a cubicle, so she raised concerns with newly-hired Marketing Director, Charon Dilber ("Dilber"), as well as Chief Financial Officer, Michael Ondruch ("Ondruch"). Dilber reassured Jurach that her disability would receive his foremost attention. Ondruch requested a doctor's note describing the condition and appropriate accommodation. Safety Vision then assigned Jurach to a cubicle next to a large window. The headaches nonetheless persisted.

Jurach requested reassignment soon thereafter, citing as the reason not only her sensitivity to artificial light, but also the temperature of the room and

eavesdropping coworkers. In a conversation on September 2, 2010, Safety Vision's Chief Executive Officer, Bruce Smith ("Smith"), asked Jurach to give the new workspace a try first. In subsequent discussions with Dilber, Jurach stated that she needed an office so that she could have a door to close from distractions. She proposed that a windowless room, used at the time to hold marketing materials, be converted into her private office. Safety Vision declined.

It would take Jurach until the end of September to produce the doctor's note that Ondruch had requested in August. At a meeting with Ondruch on September 27, 2010, Jurach presented her CFO with the letter, dated September 20, 2010, stating that she "suffers from constant dilation, which causes severe light sensitivity to her eyes." In a subsequent letter, received by Jurach in early October, her doctor elaborates: "If you can possibly accommodate [Jurach] to a less lighted area, it would be very beneficial to her." Safety Vision disputes having ever been given the second letter. In any event, after their meeting on September 27, Ondruch assured Jurach that he would "take [her] request into consideration." Ondruch allegedly called Jurach's doctor, whose assistant told him that appropriate accommodations would include "dimmer lights," "tinted glasses," and "fewer hours working on computer monitors."

As a temporary accommodation, Jurach proposed to Dilber that she be allowed to work from home each week on Monday and Friday afternoons, and all day on Wednesday. Dilber accepted the proposal and instructed Jurach, in an email on September 29, to begin this home-office arrangement immediately. In addition, Dilber sought to secure, for Jurach's use, a conference room on the first floor of the building, in which meetings were only occasionally held.

Jurach would be fired fifteen days later, however, before a long-term solution was found.

Jurach's termination was part of a multi-phase reduction in force ("RIF") claimed by Safety Vision to have been implemented as a "strategic business cost reduction plan" in response to a global financial crisis. In total, the Company laid off twenty-four employees, or twenty-five percent of its workforce, and reduced its annual payroll by over a million dollars. While Jurach survived the first two phases of the RIF, consisting of fifteen lay-offs and occurring in June and August of 2010, she was not as fortunate in the third and final phase. On October 14, 2010, Jurach was terminated along with eight other employees. Ultimately, her position as Trade Show Coordinator was subsumed by Melissa Foteh ("Foteh"), a younger marketing employee who was not disabled and was paid less than Jurach.

## DISCUSSION

### I.    Objection to Removal

Jurach first argues that the district court erred by not granting her motion to remand, which she filed as an alternative pleading to a motion to amend her complaint. The motion to remand was based on the timeliness of Safety Vision's removal, which is a procedural challenge that may be waived. *See Harris v. Edward Hyman Co.*, 664 F.2d 943, 945 (5th Cir. 1981) (noting that "strict compliance with the limitations period in the removal statute does not affect the jurisdiction of the district court and that 'failure to file the petition within the allotted time may be waived'") (quoting *Weeks v. Fidelity & Cas. Co.*, 218 F.2d 503, 504 (5th Cir. 1955)). Although Rule 8 of the Federal Rules of Civil Procedure permits the alternative pleading of inconsistent claims and defenses, a plaintiff risks waiver by participating in federal court

proceedings, beyond the filing of a motion to remand. *See Harris*, 664 F.2d at 945. Other circuits too have made this point clear. *See Koehnen v. Herald Fire Ins. Co.*, 89 F. 3d 525, 529 (8th Cir. 1996).[1]

In this case, Jurach couched her request for remand as a fall back to her motion to amend, stating at the outset of the pleading: "[I]f the motion to amend is not granted, Plaintiff moves the court to remand this action." Because the district court granted the motion to amend, it is not necessary for us to consider the issue of whether a plaintiff may move for remand in the alternative, without waiving a procedural objection to removal, and, if so, whether Jurach erred in the order of her motions. She received the very object of her design.

## II.    Objections to Summary Judgment

This Court reviews *de novo* the decision of a district court to grant summary judgment, applying standards identical to those used at the trial level. *Pratt v. City of Houston*, 247 F.3d 601, 605-06 (5th Cir. 2001) (citing *Walker v. Thompson*, 214 F.3d 615, 624 (5th Cir. 2000)). The initial burden is on the moving party to demonstrate to the court an absence in the record of a genuine issue of material fact. *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-25 (1986)). If successful, the burden shifts to the nonmoving party, who must "go beyond the pleadings and by her own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that

---

[1]     In *Koehnen*, the Eight Circuit affirmed the denial of a motion to remand based on the plaintiff's "prior affirmative conduct in federal court." 89 F. 3d 525, 529 (8th Cir. 1996). There, the plaintiff first filed a motion for leave to file a new complaint, which the district court denied before hearing a subsequent motion to remand. *Id.* at 528. Rather than briefing and arguing the first substantive motion, the *Koehnen* court reasoned that the plaintiff should have moved to have the motion withdrawn or its consideration stayed, pending the outcome of the remand motion. *Id.* Because he did not, the court concluded that the plaintiff was forbidden from unfairly taking "a second bite at the apple." *Id.*

there is a genuine issue for trial." *Celotex*, 477 U.S. at 324. "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994)). Rather, the nonmoving party must establish with specific facts a genuine dispute as to each essential element of a claim. *Id.* Creating a "genuine" dispute requires the nonmoving party to produce evidence sufficient to enable a reasonable jury to return a verdict in its favor. *Id.* Summary judgment is proper if the court, after reviewing the evidence in the light most favorable to the nonmoving party, determines that there is no genuine factual dispute and the moving party is entitled to judgment as a matter of law. *See Smith v. City of Jackson*, 351 F.3d 183, 185 (5th Cir. 2003).

### 1. Failure-to-Accommodate Claim

Jurach argues that Safety Vision failed to accommodate her disability, in violation of the Texas Commission on Human Rights Act (TCHRA), TEX. LAB. CODE § 21.001 *et seq.* An express purpose of Chapter 21 is to provide for the execution of the policies embodied in Title I of the Americans with Disabilities Act of 1990 (ADA) and its subsequent amendments. TEX. LAB. CODE § 21.001(3); *see Talk v. Delta Airlines, Inc.*, 165 F.3d 1021, 1024 n.4 (5th Cir. 1999). Accordingly, Texas state courts apply analogous federal statutes and cases when interpreting the TCHRA. *See Talk*, 165 F.3d at 1021; *Hoffman-La Roche Inc. v. Zeltwanger*, 144 S.W.3d 438, 445-46 (Tex. 2004) ("[F]ederal case law may be cited as authority in cases relating to the Texas Act."). The ADA and TCHRA place an affirmative duty on covered employers to reasonably accommodate the known mental and physical limitations of their employees. *See Picard v. St. Tammany Parish Hosp.*, 611 F.Supp.2d 608, 618

No. 15-20018

(E.D.La. 2009). To make out a failure-to-accommodate claim, a plaintiff must show: (1) she is a qualified individual with a disability; (2) her employer knew of the disability and its consequential limitations on the plaintiff; and (3) the employer failed to make reasonable accommodations for such known limitations. *Feist v. Louisiana Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013). When an employer is required by law to provide an accommodation, its failure to do so is considered a prohibited form of discrimination. *Picard*, 611 F.Supp.2d at 618.

In the case *sub judice*, Safety Vision challenges neither Jurach's status as a qualified individual nor its knowledge of her disability and consequential limitations. Jurach's appeal on this claim, therefore, turns on whether Safety Vision fell short of its duty to reasonably accommodate Jurach.

An employee's request for an accommodation triggers an obligation on behalf of the employer to engage with good faith in an interactive process to identify an appropriate accommodation. *See Griffin v. United Parcel Service, Inc.*, 661 F.3d 216, 224 (5th Cir. 2011). The purpose of this required interaction is for the parties to identify reasonably available accommodations. *See Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 735-36 (5th Cir. 1999) (explaining the need for a bilateral dialogue due to information asymmetry). The exact contours of the process are unique to each case. *Id.* An employer is liable when its unwillingness to participate in the process leads to a failure to reasonably accommodate. *Griffin*, 661 F.3d at 224. However, "[a]n employer that 'demonstrates good faith efforts' to engage in the interactive process and to make a reasonable accommodation is shielded from liability." *Picard*, 611 F.Supp.2d at 621 (E.D.La.2009) (citing 42 U.S.C. § 1981a(a)(3)). Ultimately, both the employer and the employee are obligated to communicate with one another so that the process of identifying an appropriate accommodation can

unfold. *See Loulseged*, 178 F.3d at 737. In situations "where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer," the burden is primarily on the employee "to specifically identify the disability and resulting limitations, and to suggest the reasonable accommodations." *Griffin*, 661 F.3d at 224 (quoting *E.E.O.C. v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621 (5th Cir.2009)).[2]

In this case, Safety Vision's obligation to engage with good faith in an interactive process arose, at the earliest, when Jurach made her first workspace request related to her sensitivity to fluorescent light, which occured in late 2008 or early 2009. The request was specifically for a private office with windows. At the time, no such space was available, and Jurach was already assigned to a private interior office in which she was permitted to have disengaged as many of the fluorescent lights overhead as she pleased and work by lamplight. This setting was remarkably close to what Jurach describes in her affidavit as an appropriate accommodation: an area lit by lamp and not fluorescent lights. In fact, prior to Jurach's second eye surgery in February, 2010, she admits to finding the interior offices to be "tolerable." She also described Rominger's promise in April, 2010 to pay attention to her situation in an upcoming relocation of the Marketing Department as "reasonable." Beyond a private office with windows, which were to be found only on the second floor of Safety Vision's two story building, Jurach made no other suggestions as to how her sensitivity to artificial light could be accommodated until the very end of her employment.

---

[2] If the need for a requested accommodation is not obvious, an employer may require that the employee provide medical documentation in advance. *Taylor v. Principal Fin. Grp., Inc.,* 93 F.3d 155, 165 n.9 (5th Cir.1996) (citing EEOC Interpretive Guidance, 29 C.F.R. § 1630.9, App.). However, the courts have not construed this rule to allow employers, such as Safety Vision, to delay in demanding documentation and then use the delay as a defense to its otherwise inexcusable failure to make an accommodation sooner.

When Safety Vision moved Jurach and the Marketing Department to the second floor in September of 2010, it assigned Jurach to a cubicle next to a large exterior window. The cubicle, while it may not have been the windowed office that Jurach would have preferred, had the perceived advantage of natural light. When she expressed dissatisfaction, maintenance personnel disengaged fluorescent rods near her workspace. Jurach, however, still found the accommodation to be inadequate and requested that she be returned to an interior office. Then, in late September, more than a month after Safety Vision had requested medical documentation, Jurach produced the first of two doctor's notes, both of which failed to provide clear accommodation instructions.[3] Just days later, a provisional arrangement was put in place allowing Jurach to work from home on three days of the week, while her manager, Dilber, sought a better solution. Unfortunately, Jurach would be released two weeks later.

As frustrated as Jurach may have been with the Company's apparent lack of an established procedure for fielding accommodation requests, the evidence does not show that Safety Vision demonstrated bad faith or an unwillingness to engage in efforts to identify and provide a reasonable accommodation. Rather, the process was complicated – and protracted – by the inconsistent reasons that Jurach gave for her accommodation requests; the ambiguous medical documentation that she produced; and, ultimately, her insistence on a preferred accommodation, to which she was not necessarily entitled. By the fall of 2010, the evidence reveals that Safety Vision was actively seeking a reasonable solution that Jurach would also find to be suitable. The third phase of the RIF in October of 2010 curtailed those efforts.

---

[3]    Of the two notes from her healthcare provider, the most instructive merely stated that Jurach would benefit from less light.

11

That is not to say, however, that Safety Vision failed its obligation to participate with good faith in an interactive process. Because Jurach has not created a genuine dispute on this point, the district court's grant of summary judgment on the failure-to-accommodate claim is affirmed.

### 2. Discriminatory Discharge

In an employment discrimination case where the plaintiff presents only indirect or circumstantial evidence, Texas courts adhere to the burden shifting framework promulgated by the U.S. Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973). *See Tex. Dep't of State Health Servs. v. Rockwood,* 468 S.W.3d 147, 152–53 (Tex.App.-San Antonio 2015, no pet.). Under this *McDonnell Douglas* approach, "the plaintiff is entitled to a presumption of discrimination if she meets the 'minimal' initial burden of establishing a prima facie case of discrimination." *Mission Consol. Ind. Sch. Dist. v. Garcia,* 372 S.W.3d 629, 634 (Tex. 2012). To satisfy her initial burden, the plaintiff must proffer evidence that: (1) she was disabled, or was regarded as disabled; (2) she was qualified for her job; and (3) she was subject to an adverse employment decision on account of her disability. *Cannon v. Jacobs Field Servs. N. Am., Inc.,* 2016 WL 157983, at *2 (5th Cir. Jan. 13, 2016) (citing *EEOC v. LHC Grp., Inc.,* 773 F.3d 688, 697 (5th Cir. 2014)).

Upon the successful demonstration of the plaintiff's *prima facie* case, the burden of production shifts to the defendant to articulate a "legitimate, nondiscriminatory reason" for the adverse employment decision, whereby the presumption of discrimination disappears. *Culwell v. City of Fort Worth,* 468 F.3d 868, 873 (5th Cir. 2006). The burden of persuasion then returns to the plaintiff to identify or offer evidence creating a factual dispute "either (1) that the defendant's reason is not true, but is instead a pretext for discrimination; or (2) that the defendant's reason, while true, is only one of the reasons for its

conduct, and another motivating factor is the plaintiff's protected characteristic ('mixed-motives alternative')." *Michael v. City of Dallas*, 314 S.W.3d 687, 691 (Tex. App.—Dallas 2010, no pet.) (quoting *Rachid v. Jack in the Box, Inc.*, 376 F.3d 305, 312 (5th Cir. 2004)).

Evening assuming that Jurach establishes her *prima facie* case, she does not create a factual dispute on the issue of pretextual discrimination. To establish pretext, a plaintiff "must put forth evidence rebutting each of the nondiscriminatory reasons the employer articulates." *Jackson v. Watkins*, 619 F.3d 463, 467 (5th Cir. 2010). As a nondiscriminatory reason for the termination, Safety Vision states that it included Jurach in a three-phase RIF, implemented by the Company to cut costs as it weathered the recession in 2010. More specifically, Safety Vision explains that its decision to include Jurach in the lay-offs made sense because the position she held as Trade Show Coordinator had not been a stand-alone position prior to 2007, and that it was able to reassign Jurach's job responsibilities to a lower-paid employee, Foteh. In addition, at the time of the termination, Jurach's manager, Dilber, stated that the Company intended to reduce its participation in trade shows. In response to these reasons given for the termination, Jurach only offers evidence indicating that Safety Vision's trade show attendance may not have declined after she was let go. Jurach does not refute that Safety Vision needed to cutback costs or show that it did not act in furtherance of this objective by eliminating the position of Trade Show Coordinator. Because she does not sufficiently rebut each of Safety Vision's articulated reasons, the only way Jurach can avoid summary judgment on her discriminatory discharge claim is to present evidence that her disability motivated the termination decision. This she does not do.

As evidence of Safety Vision's purported discriminatory motive, Jurach cites the reassignment of trade show coordinating duties to Foteh. Arguing that no rational basis existed for this arrangement, Jurach notes that the job required supervising an "older, seasoned" sales force and Foteh was only a recent college graduate with less experience than she. To the extent it is proper to compare and contrast the qualifications of the two employees, the Court is unmoved by Jurach's argument. *See Little v. Tex. Dept. of Criminal Justice,* 177 S.W.3d 624, 632 (Tex.App.-Houston [1st Dist] 2005, no pet.) ("[E]vidence of relative qualifications must be more than merely subjective and speculative."); *Bodenheimer v. PPG Indus., Inc.,* 5 F.3d 955, 959 (5th Cir. 1993) (explaining that, while time may prove a personnel decision to have been poor, the courts were not intended to be second-guessers of employment decisions or personnel managers). Safety Vision offers multiple reasons in support of its decision to replace Jurach with Foteh. In addition to the aforementioned facts that Foteh made less money and that the role of Trade Show Coordinator had only become an independent position just a few years prior, the record shows that Foteh was the only one of the two with a college degree. Thus, if there is an illicit inference to be taken from Jurach's replacement, it requires the Court to make subjective and speculative conclusions regarding Foteh's qualifications for the job. The evidence on this point is ultimately too weak to create a genuine issue concerning the Company's motivation.

In addition, Jurach argues that her disability's impact on the Company's healthcare expenditures drove its decision to terminate her. To support this contention, Jurach invokes Safety Vision's purported treatment of another employee, Charles Garrett ("Garrett"), who had cancer at the time he was hired by Safety Vision and was kept on COBRA continuation coverage from a previous employer. When the COBRA coverage expired, Jurach alleges that

Safety Vision terminated Garrett to avoid having to place him on the Company's health insurance rolls. Likewise, Jurach argues that Safety Vision fired her to avoid costs associated with her disability.

Even if the citations to the record provided by Jurach supported her allegations, she has not shown an illicit inference from Safety Vision's treatment of Garrett to be warranted. First, the Company was aware of the medical conditions of both Garrett and Jurach at the time they were hired. Second, Garrett not only agreed to stay on his COBRA coverage at that time he was hired, but he has actually stated that he preferred the arrangement. Finally, Jurach does not proffer any evidence or argument to refute the position of Safety Vision's that it had no knowledge of the individualized impact of its employees on the Company's health insurance costs. Ultimately, Jurach's argument is supported only by the proximity in time between the expiration of Garrett's COBRA benefits and his termination. Alone, the timing of the two events amounts to but a mere scintilla of evidence of discriminatory motive. Accordingly, the district court properly disposed of this discriminatory discharge claim.

### 3. Retaliation Claim

The TCHRA forbids an employer from retaliating against an employee who engages in certain protected activities, such as opposing a discriminatory practice. TEX. LAB. CODE § 21.055. As with discriminatory discharge claims, the *McDonnell Douglas* burden-shifting framework similarly applies to retaliation claims. This framework requires a plaintiff to make first a *prima facie* showing that: (1) a protected activity occurred; (2) an adverse employment action followed; and (3) a causal link existed between the protected activity and the adverse employment action. *Chandler v. CSC Applied Technologies, LLC*, 376 S.W.3d 802, 822 (Tex. App.-Houston [1st Dist.] 2012, pet. denied). Once a

*prima facie* showing has been made, and the defendant articulates a legitimate reason for the adverse employment action, a plaintiff is left to demonstrate that "the employer's stated reason for the adverse action was merely a pretext for the real, discriminatory purpose." *Pineda v. United Parcel Service, Inc.,* 360 F.3d 483, 487 (5th Cir. 2004) (quoting *Gee v. Principi,* 289 F.3d 342, 345 (5th Cir. 2002)). To avoid summary judgment, a plaintiff arguing pretext is required to "show 'a conflict in substantial evidence' on the question of whether the employer would not have taken the action 'but for' the protected activity." *Feist v. Louisiana Dep't of Justice, Office of the Atty. Gen.*, 730 F.3d 450, 454 (5th Cir. 2013). Evidence is substantial if it is "of such quality and weight that reasonable and fair-minded persons in the exercise of impartial judgment might reach different conclusions." *Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 993 (5th Cir. 1996) (citing *Boeing Co. v. Shipman,* 411 F.2d 365, 374 (5th Cir. 1969) (en banc)).

Here, even if we again assume that Jurach establishes her *prima facie* case, she fails to overcome Safety Vision's legitimate, non-discriminatory reason for her termination: a RIF due to the Company's declining financial state. Jurach's rebuttal is premised heavily on the temporal proximity of the accommodation requests she made to the Company's top executives, Smith and Ondruch, and her termination thereafter. While close timing may be sufficient evidence of the casual connection needed for a plaintiff's *prima facie* case, "once the employer offers a legitimate, nondiscriminatory reason that explains both the adverse action and the timing, the plaintiff must offer some evidence from which the jury may infer that retaliation was the real motive." *Swanson v. Gen Servs. Admin*, 110 F.3d 1180, 1188 (5th Circ. 1997); *see Love v. Motiva Enterprises LLC*, 349 F. App'x 900, 905 (5th Cir. 2009) ("The suspicious timing

of employment action along with significant other evidence of pretext can defeat a summary judgment motion.").

As proof of retaliation, Jurach relies on two instances of post-termination conduct by Safety Vision. First, Safety Vision conditioned the provision of a letter of recommendation for Jurach on her execution of a severance agreement that was given to all terminated employees. Second, Safety Vision reduced the amount of a *gratuitous* payout that it made to Jurach to recover expenses she incurred and charged *after* she had been let go. While subsequent behavior may be probative of an employer's intent at the time of termination, the actions of Safety Vision in this instance were innocuous. Notably, it was obligated to provide neither the recommendation letter nor the severance payment, but did so voluntarily. Moreover, there is no evidence that Safety Vision handled Jurach any differently post-termination than it did the other employees in the RIF. Thus, evidence related to Safety Vision's provision of a recommendation letter and a severance payment can just as easily be viewed as favorable to the Company, and it does not create a conflict in substantial evidence on the question of the true reason for the termination. Accordingly, the district court's grant of summary judgment on Jurach's retaliation claim was proper.

## CONCLUSION

For the foregoing reasons, we AFFIRM.