# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 23, 2026

Lyle W. Cayce
Clerk

_____

No. 25-40200

_____

Brenda Brenyah,

*Plaintiff—Appellant*,

*versus*

Columbia Hospital Corporation of Bay Area, *doing business as* Corpus Christi Medical Center, *also known as* CCMC, *doing business as* Corpus Christi Medical Center and Bay Area Healthcare Group, Limited; Bay Area Healthcare Group Limited, *doing business as* Corpus Christi Medical Center,

*Defendants—Appellees*.

_____

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 2:21-CV-87

_____

Before Elrod, *Chief Judge,* and Richman and Willett, *Circuit Judges*.

Jennifer Walker Elrod, *Chief Judge*:

Plaintiff–Appellant Brenda Brenyah appeals the district court's grant of summary judgment dismissing her Title VII, Section 1981, and ADA claims against her former employer, Defendants–Appellees Columbia Hospital Corporation of Bay Area and Bay Area Healthcare Group, d/b/a

No. 25-40200

Corpus Christi Medical Center (collectively, "CCMC"). We AFFIRM the grant of summary judgment as to all of Brenyah's claims except for her Title VII and Section 1981 hostile-work-environment claims, which we REVERSE and REMAND for further proceedings.

I

A

CCMC is a multi-hospital healthcare system that owns Bay Area Hospital, Doctors Regional Hospital, and other healthcare facilities. Brenyah, a black woman and naturalized U.S. citizen born in Ghana, began working at CCMC's Bay Area Hospital as a registered nurse in March 2017. Brenyah was subject to a 90-day probation period after she was hired.

Brenyah alleges that, starting in April 2017, several nurses in her unit discriminated against her and other black nurses, including Lawrence "Oscar" Dike. She alleges that, among other things, Hispanic nurses mocked her and Dike's African food and accents, made unflattering comments about black employees, and expressed preferences for Filipino employees. Brenyah avers that such incidents occurred frequently, sometimes almost every shift, which offended her and impaired her work.

Brenyah alleges that she reported this behavior to multiple supervisors but that they took insufficient action, conducting an unsatisfactory investigation and allowing the behavior to continue. Brenyah's supervisors offered her a transfer to a different department, but she declined. After she continued to report allegedly discriminatory and harassing behavior, Brenyah alleges, these supervisors retaliated against her by issuing informal "coachings" and formal disciplinary actions and by extending her probation, citing poor time management and patient issues.

No. 25-40200

In August 2017, Brenyah was in a car accident and took medical leave. Experiencing increasing pain and discomfort, she sought treatment at Doctors Regional Hospital on August 25, 2017, just hours before Hurricane Harvey made landfall. She did not have an appointment. The hospital was on lockdown due to the impending hurricane, meaning that only essential, on-duty hospital personnel were permitted to be present. When questioned about her presence, Brenyah had several contentious interactions with on-duty personnel, including a few individuals with whom she had worked at Bay Area Hospital. A security guard threatened to call the police if Brenyah did not leave the premises, but he ultimately escorted her to the emergency department, where a nurse practitioner examined her and provided her with a pain prescription. After that, two police officers present in the emergency department escorted Brenyah off the premises.

Brenyah was later diagnosed with a herniated disc and torn knee ligament, which limited her ability to sleep, walk, stand, lift, and bend. Based on these injuries, her doctor recommended that she remain out of work through November 25, 2017 and then return to work with restrictions of "no heavy lifting of more than 5 lbs., physical strenuous activity and movement and walking up and down stairs" between November 26, 2017 and January 7, 2018.

Brenyah first contacted CCMC about her return to work on January 5, 2018. She asked to be placed back on the work schedule but emphasized her desire to complete an orientation refresher before resuming work. After several weeks of back-and-forth communication with Director of Patient Care Services Jason Sewell regarding her need to complete computer-based training assignments and her desire for an additional in-person training session, Brenyah spoke on the phone with her new supervisor on March 13, 2018, and asked about the possibility of a further two weeks of floor reorientation upon her return. When Brenyah did not hear back from the

supervisor within eight days, she mailed Sewell a letter on March 21, 2018, advising him of her forced resignation and citing discrimination, harassment, and retaliation.

B

Brenyah filed two charges of discrimination with the Equal Employment Opportunity Commission (EEOC). She then sued CCMC in May 2021 for: (1) race and national origin discrimination, hostile work environment, and retaliation, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*; (2) race discrimination, hostile work environment, and retaliation, in violation of 42 U.S.C. § 1981; and (3) disability discrimination and failure to accommodate, in violation of the Americans with Disabilities Act of 1990, as amended by the ADA Amendments Act of 2008, 42 U.S.C. §§ 12101 *et seq.*

CCMC moved for summary judgment. The magistrate judge recommended overruling in part and sustaining in part Brenyah's evidentiary objections and granting summary judgment. The district court adopted the magistrate judge's findings of fact and conclusions of law, overruled Brenyah's objections to the recommendation, and granted summary judgment for CCMC on all claims. Brenyah timely appealed.

C

A few months after Brenyah sued CCMC, Dike also sued CCMC, alleging Title VII and Section 1981 discrimination, hostile-work-environment, and retaliation claims based on many of the same facts alleged in Brenyah's suit. The district court granted summary judgment for CCMC on all of Dike's claims. *Dike v. Columbia Hosp. Corp. of Bay Area*, No. 2:21-cv-308, 2024 WL 347935 (S.D. Tex. Jan. 2, 2024). Last year, we affirmed this grant of summary judgment as to Dike's Title VII discrimination and retaliation claims and Section 1981 claims but vacated as to his Title VII

hostile-work-environment claim.  *See Dike v. Columbia Hosp. Corp. of Bay Area*, No. 24-40058, 2025 WL 315126, at *1 (5th Cir. Jan. 28, 2025).

II

We first consider CCMC's argument that Brenyah failed to exhaust her administrative remedies as to her Title VII and ADA claims.

"Exhaustion occurs when the plaintiff files a timely charge [of discrimination] with the EEOC and receives a statutory notice of right to sue." *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 379 (5th Cir. 2002) (citing *Dao v. Auchan Hypermarket*, 96 F.3d 787, 788–79 (5th Cir. 1996)).  Under Title VII and the ADA, a plaintiff must file a charge of discrimination within 180 days of the alleged discriminatory act.    42 U.S.C. §§ 2000e-5(e)(1), 12117.

Brenyah filed two charges with the EEOC.  The first was timely and the second was not.  Her first charge, filed on December 22, 2017 and amended on January 3, 2018, alleged discriminatory conduct through September 2017.  Brenyah timely filed it within the 180-day filing window.

Brenyah filed a letter on January 25, 2019 and a second charge on February 12, 2019, alleging additional discriminatory and retaliatory conduct that ended, at latest, when she resigned from CCMC on March 21, 2018.  As both were filed far beyond the 180-day deadline of September 17, 2018, they were untimely.  Brenyah nonetheless contends that her second charge was timely because a government shutdown tolled the deadline.  But the EEOC's website indicates that the government shutdown extended submission deadlines only for "document[s] or . . . responses" that the EEOC "*asked* [individuals] to submit."  It did not extend the deadline to file a charge of discrimination.  So Brenyah's second charge was untimely.

Accordingly, Brenyah has only exhausted her administrative remedies as to her Title VII and ADA claims to the extent they are based on facts contained in her first charge of discrimination. We only consider these exhausted portions of her claims.

## III

We review the district court's grant of summary judgment *de novo*, applying the same standards as the district court. *Hightower v. Tex. Hosp. Ass'n*, 65 F.3d 443, 447 (5th Cir. 1995). "In doing so, we view all facts in the light most favorable to the non-movant . . . and draw all reasonable inferences in h[er] favor." *Gray v. White*, 18 F.4th 463, 467 (5th Cir. 2021).

When a party moves for summary judgment on a claim on which the opposing party will bear the burden of proof at trial, the moving party can meet its summary-judgment obligation by pointing the court to the absence of admissible evidence to support the nonmovant's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25 (1986). Once the moving party does so, the nonmovant must go beyond her pleadings and designate specific facts showing that there is a genuine dispute of material fact for trial. *Id.* at 324; *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). A dispute is genuine if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is mandatory if the nonmovant fails to meet this burden. *Little*, 37 F.3d at 1076.

## IV

The district court correctly granted summary judgment as to Brenyah's Title VII race- and national-origin-discrimination claims and her Section 1981 race-discrimination claim. "The analysis of discrimination claims under § 1981 is identical to the analysis of Title VII claims," *Body by*

*Cook, Inc. v. State Farm Mut. Auto. Ins.*, 869 F.3d 381, 386 (5th Cir. 2017), so we analyze these claims together.

A

When a plaintiff bases her discrimination claim on circumstantial evidence, she must show that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) others similarly situated but outside of her protected class were treated more favorably. *Saketkoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 997–98 (5th Cir. 2022). If she does so, the burden shifts to the employer to "produce a legitimate nondiscriminatory reason for the adverse employment decision." *Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001). If the employer presents a legitimate, nondiscriminatory reason, the burden shifts back to the plaintiff to prove that this reason was merely a pretext for discrimination. *Id.* at 219–20.

B

Although Brenyah has proved a *prima facie* case of discrimination as to the extension of her probation, her Title VII and Section 1981 discrimination claims ultimately fail because she has not shown a genuine dispute of material fact as to whether CCMC's reason for extending her probation was a pretext for discrimination—even to the extent these discrimination claims are based on facts contained in Brenyah's first, timely charge of discrimination.

1

Because the parties dispute only the "adverse employment action" element of Brenyah's discrimination claims, we address only this element of the *prima facie* case. Brenyah identifies five adverse employment actions that she allegedly suffered: (i) extension of her probation; (ii) denial of light duty;

(iii) refusal to return her to work after medical leave; (iv) constructive discharge; and (v) denial of medical care at and removal from Doctors Regional. Only her extension-of-probation theory is viable.

"Adverse employment actions" include adverse decisions in "hiring, firing, compensation, or in the 'terms, conditions, or privileges'" of employment. *Hamilton v. Dallas County*, 79 F.4th 494, 502 (5th Cir. 2023) (en banc) (quoting 42 U.S.C. § 2000e-2(a)(1)). The phrase "terms, conditions, or privileges" of employment is broad and "covers more than the 'economic or tangible.'" *Muldrow v. City of St. Louis*, 601 U.S. 346, 354 (2024) (first quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78 (1998); then quoting *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)). But the plaintiff "must show some harm respecting an identifiable term or condition of employment." *Id.* at 354–55.

Extension of an employee's probation can be an "adverse employment action" if it affects an identifiable term or condition of employment. *See, e.g.*, *Stewart v. Mo. Pac. R.R. Co.*, 121 F. App'x 558, 562–63 (5th Cir. 2005) (explaining that an employee's placement on probation is not an "adverse employment action" unless it "alter[s] [the plaintiff's] employment status"); *Tolbert v. Smith*, 790 F.3d 427, 435–36 (2d Cir. 2015) (explaining that extending an employee's probation was an "adverse employment action" when it exposed plaintiff to at-will termination and was coupled with denial of tenure).

Brenyah offers evidence that, at CCMC, employees on probation were subject to termination without cause and did not accrue seniority, making them more exposed than non-probationary employees to non-selection and layoff. This evidence shows "some harm respecting an identifiable term or condition of [Brenyah's] employment." *Muldrow*, 601 U.S. at 355. She has

therefore satisfied her burden as to the "adverse employment action" element and, thus, her *prima facie* case as a whole.

2

Nonetheless, Brenyah's discrimination claims fail because she has not shown a genuine dispute of material fact as to whether CCMC's reason for extending her probation was a pretext for discrimination.

When the burden shifts back to the plaintiff to show pretext, she must produce "substantial evidence" that the employer's proffered reason for the adverse employment action is a pretext for discrimination. *Watkins v. Tregre*, 997 F.3d 275, 283 (5th Cir. 2021) (quoting *Laxton v. Gap Inc.*, 333 F.3d 572, 578 (5th Cir. 2003)). "Evidence is 'substantial' if it is 'of such quality and weight that reasonable and fair-minded [people] in the exercise of impartial judgment might reach different conclusions.'" *Laxton*, 333 F.3d at 579 (quoting *Long v. Eastfield Coll.*, 88 F.3d 300, 308 (5th Cir. 1996)). To establish pretext through disparate treatment, an employee must produce evidence of a comparator who was similarly situated to her. *Owens v. Circassia Pharms., Inc.*, 33 F.4th 814, 827 (5th Cir. 2022). The employment actions must be taken "under nearly identical circumstances." *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009) (quoting *Little v. Republic Refin. Co.*, 924 F.2d 93, 97 (5th Cir. 1991)).

CCMC has produced a legitimate, nondiscriminatory reason for extending Brenyah's probation: namely, Brenyah's time-management and documentation issues. CCMC points to evidence that Brenyah's supervisors discussed time-management issues with her at least twice before her initial probation ended, that her 90-day formal evaluation highlighted time-management and performance issues, and that she received multiple coachings regarding documentation and a time-management action plan. Further, Brenyah's time records show that she extended her shift by at least

an hour on 44 of 55 shifts so that she could complete her patient documentation. This evidence is sufficient to meet CCMC's burden of production. *See Watkins*, 997 F.3d at 282 (explaining that poor work performance, "when coupled with specific examples," is a legitimate, nondiscriminatory reason for an adverse employment action (quoting *Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 231 (5th Cir. 2015)).

But Brenyah has not met her corresponding burden of proving pretext. She asserts that she never received a time-management plan or time-management coaching, but the record directly contradicts that assertion. She also contends that two Hispanic nurses extended their shifts "several times" and were not written up for time-management problems, but the record shows that both extended their shifts far less frequently than Brenyah. Further, Brenyah asserts that she was assigned a heavy workload of high-acuity patients without support, but she provides no evidence that nurses outside of her protected groups were treated differently under nearly identical circumstances or that CCMC intentionally gave her a heavier workload. Thus, even viewing the evidence in the light most favorable to Brenyah, we cannot say that she has met her summary-judgment burden as to her race- and national-origin-discrimination claims.

V

The district court correctly granted summary judgment as to Brenyah's Section 1981 contractual-discrimination claim.

To establish a § 1981 claim for contractual discrimination, a plaintiff must establish that she (1) is a member of a racial minority; (2) the defendant intended to discriminate on the basis of race; and (3) the discrimination "concerned one or more of the activities enumerated in the statute—here, making a contract." *Body by Cook*, 869 F.3d at 386. The plaintiff must demonstrate "the loss of an actual, not speculative or prospective, contract

interest." *Arguello v. Conoco, Inc.*, 330 F.3d 355, 358 (5th Cir. 2003) (quoting *Morris v. Dillard Dep't Stores, Inc.*, 277 F.3d 743, 751 (5th Cir. 2001)). An allegation of "the mere possibility" that a service provider "'would interfere with a customer's right to contract in the future' is insufficient to support recovery." *Id.* (quoting *Morris*, 277 F.3d at 752). Instead, the plaintiff "must offer evidence of some tangible attempt to contract" that in some way was "'thwarted' by the defendant." *Id.* (quoting *Morris*, 277 F.3d at 752). A completed transaction is not actionable. *Id.* at 359.

Brenyah contends that the CCMC employees' actions at Doctors Regional constituted race discrimination that interfered with her ability to contract for medical care. But this contention fails because Brenyah did actually receive care at Doctors Regional, meaning that she was not "thwarted" from completing her desired transaction. *See id.* at 358. Her contention that she should have received different care is supported by no evidence in the record and is therefore "speculative." *Id.*

## VI

The district court correctly granted summary judgment as to Brenyah's ADA disability-discrimination claim.

We have regularly applied Title VII standards to ADA discrimination claims, *see, e.g.*, *Stringer v. N. Bolivar Consol. Sch. Dist.*, 727 F. App'x 793, 799 n.3 (5th Cir. 2018) (collecting cases), so we apply that standard here. To make out a *prima facie* case of ADA disability discrimination, a plaintiff must show that: (1) she had a disability; (2) she was qualified for the position; and (3) there was a causal connection between her disability and an adverse employment action. *Rodriguez v. Eli Lilly & Co.*, 820 F.3d 759, 765 (5th Cir. 2016) (citing *EEOC v. LHC Grp.*, 773 F.3d 688, 697 (5th Cir. 2014)). If the plaintiff meets this burden, the defendant "can rebut the presumption of discrimination by articulating legitimate business reasons for the adverse

action." *Id.* (citing *LHC Grp.*, 773 F.3d at 701). If the defendant provides a legitimate reason, the plaintiff must offer evidence showing that that reason was a pretext for discrimination. *Id.* (citing *LHC Grp.*, 773 F.3d at 702).

Brenyah has not established a genuine dispute of material fact as to whether a causal connection existed between her disability and an adverse employment action. As set out above, Brenyah's only viable adverse employment action is CCMC's extension of her probation. *See supra* § IV(B). But CCMC extended her probation before she developed her disability. Brenyah therefore has not proven all elements of her disability-discrimination claim and the district court correctly granted summary judgment on it, even to the extent it is based on facts contained in Brenyah's first, timely charge of discrimination.

VII

The district court correctly granted summary judgment as to Brenyah's Title VII, Section 1981, and ADA retaliation claims. The legal framework governing Title VII, Section 1981, and ADA retaliation claims is coextensive, *see Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 651 (5th Cir. 2004); *Feist v. La., Dep't of Just., Off. of Att'y Gen.*, 730 F.3d 450, 454 (5th Cir. 2013), so we analyze them together.

To make a successful retaliation claim, a plaintiff must show that: (1) she engaged in activity protected by the relevant statute; (2) an adverse employment action occurred; and (3) a causal link existed between the protected activity and the adverse employment action. *Willis v. Cleo Corp.*, 749 F.3d 314, 317 (5th Cir. 2014) (Title VII, Section 1981); *Lyons v. Katy Indep. Sch. Dist.*, 964 F.3d 298, 304 (5th Cir. 2020) (ADA). If the plaintiff presents a *prima facie* case, the burden shifts to the employer to "proffer a legitimate rationale for the underlying . . . employment action." *Davis v. Dall. Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004) (citing *Aldrup v.*

*Caldera*, 274 F.3d 282, 286 (5th Cir. 2001)). If a legitimate reason is proffered, the burden returns to the plaintiff to demonstrate that "the employer's articulated reason for the employment action was a pretext for retaliation." *Id.* (citing *Aldrup*, 274 F.3d at 286).

Brenyah has not met her summary-judgment burden as to the causation element. The causation standard for retaliation claims is "but for" causation. *Hernandez v. Yellow Transp., Inc.*, 670 F.3d 644, 660 (5th Cir. 2012). Brenyah has offered no evidence creating a genuine dispute of material fact that, but for her complaints to Sewell, her probation would not have been extended. Rather, the record shows that CCMC decided to extend Brenyah's probation based on her demonstrated difficulties with time management and documentation. Brenyah therefore has not proven all elements of her retaliation claims and the district court correctly granted summary judgment on them, even to the extent they are based on facts contained in Brenyah's first, timely charge of discrimination.

## VIII

The district court correctly granted summary judgment on Brenyah's ADA interference claim.

"While this court has not yet articulated a test for evaluating ADA interference claims, the cause's requirements can be derived from the statutory text." *Strife v. Aldine Indep. Sch. Dist.*, 138 F.4th 237, 251 (5th Cir. 2025). "Distilled, the statute has at least three requirements: (1) coercion, intimidation, threats, or interference toward an individual, (2) on the basis of that individual's exercise or enjoyment, or having exercised or enjoyed, or aiding or encouraging others in exercising or enjoying, (3) any right protected under the ADA." *Id.*; *see* 42 U.S.C. § 12203(b). Other circuits have added additional elements to this test. *Strife*, 138 F.4th at 251 (collecting cases).

No. 25-40200

Brenyah has not demonstrated a genuine dispute of material fact as to whether CCMC interfered with a right that the ADA protects. Again, she asserts that CCMC employees' actions at Doctors Regional interfered with her ability to seek and obtain medical care for her disability. She points to evidence that non-employees received treatment at the Doctors Regional emergency department on August 25, 2017, and that some people without armbands designating them as individuals allowed to remain at the hospital during the hurricane were allowed to stay on the premises when she was not. But, as discussed above, Brenyah *did* receive medical care at Doctors Regional. She therefore has not proven all elements of her ADA interference claim and the district court correctly granted summary judgment on it, even to the extent it is based on facts contained in Brenyah's first, timely charge of discrimination.

IX

The district court correctly granted summary judgment as to Brenyah's ADA failure-to-accommodate claim.

It is unlawful for an employer to fail to make "reasonable accommodations to the known physical . . . limitations of an otherwise qualified individual with a disability" unless the employer can show "that the accommodation would impose an undue hardship on the operation of the business." 42 U.S.C. § 12112(b)(5)(A). Once an employee requests an accommodation, the employer must participate in an interactive process to determine what reasonable accommodations might be available. *LHC Grp.*, 773 F.3d at 699 (citing *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 622 (5th Cir. 2009)). The ADA "does not provide a right to an employee's preferred accommodation but only to a reasonable accommodation." *Kitchen v. BASF*, 952 F.3d 247, 254 (5th Cir. 2020) (citing *EEOC v. Agro Distrib., LLC*, 555 F.3d 462, 471 (5th Cir. 2009)).

14

A reasonable accommodation can include "job restructuring, part-time or modified work schedules, reassignment to a vacant position," or "other similar accommodations for individuals with disabilities. 42 U.S.C. § 12111(9)(B). But "[t]he ADA does not require an employer to relieve an employee of any essential functions of his or her job, modify those duties, reassign existing employees to perform those jobs, or hire new employees to do so." *Burch v. City of Nacogdoches*, 174 F.3d 615, 621 (5th Cir. 1999) (first citing *Robertson v. Neuromedical Ctr.*, 161 F.3d 292, 295 (5th Cir. 1998); and then citing *Barber v. Nabors Drilling U.S.A., Inc.*, 130 F.3d 702, 709 (5th Cir. 1997)). If an employee seeks reassignment to a vacant position, she must show that she is qualified for that position. *Id.* at 621–22. "An employer is not required to create 'light duty' jobs to accommodate." *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 809 (5th Cir. 1997) (*Turco v. Hoechst Celanese Chem. Grp., Inc.*, 101 F.3d 1090, 1094 (5th Cir. 1996)).

Brenyah has not shown a genuine dispute of material fact as to whether CCMC failed to accommodate her disability. She asserts that she "was released for light duty and [CCMC] was advised of this," such that CCMC should have engaged with her in an interactive process regarding accommodations. But whether Brenyah actually advised CCMC that she needed accommodations is questionable on this record. On August 23, 2017, Brenyah told Sewell that her doctor had recommended "immediate physical therapy, light duty and today off." The next day, Brenyah told Sewell that she had been granted "eligibility for general leave of absence" and had not yet been able to get physical therapy. On August 30, 2017, when Sewell asked her about the status of her return to work, Brenyah again told him that she had not yet received treatment but provided no other updates and did not mention accommodations. Brenyah later told Sewell that she would "continue to be out on leave" but provided no other information about her condition.

No. 25-40200

Brenyah's next text-message exchanges with Sewell were between January and March 2018, when Brenyah sought to arrange her return to work. During this time, Brenyah never indicated to Sewell or others that she needed accommodations; she did, however, request reorientation and training. Furthermore, Brenyah's doctor's records, which she apparently sent to CCMC during her medical leave, show that her doctor recommended physical restrictions at work only through January 7, 2018. By sending these records to CCMC, Brenyah could actually be said to have put CCMC on notice that she no longer needed accommodations by the time she sought to return to work. And the record contains no evidence that Brenyah told anyone else between January and March 2018 that she needed accommodations when returning to work. Accordingly, Brenyah has not proven her failure-to-accommodate claim and the district court correctly granted summary judgment on it, even to the extent it is based on facts contained in Brenyah's first, timely charge of discrimination.

X

We next address Brenyah's argument that the district court wrongly overruled two of her evidentiary objections. We disagree. We review the district court's rulings on evidentiary objections "under the deferential abuse-of-discretion standard." *Koch v. United States*, 857 F.3d 267, 277 (5th Cir. 2017) (citing *Kelly v. Boeing Petroleum Servs., Inc.*, 61 F.3d 350, 356 (5th Cir. 1995)).

First, the district court did not abuse its discretion in overruling Brenyah's spoliation objection. Brenyah maintains that CCMC acted in bad faith when it failed to preserve video footage of her interactions with staff and security at Doctors Regional. Bad faith in the spoliation-of-evidence context "generally means destruction for the purpose of hiding adverse evidence." *Van Winkle v. Rogers*, 82 F.4th 370, 375 (5th Cir. 2023) (quoting *Guzman v.*

16

*Jones*, 804 F.3d 707, 713 (5th Cir. 2015)).  But nothing in the record indicates that CCMC intentionally destroyed this video evidence.

Second, the district court did not abuse its discretion in admitting the EEOC's September 10, 2019 letter informing her of its preliminary decision to dismiss the case.  Brenyah asserts that this document "is contradicted by competent summary judgment evidence."  But she fails to identify with specificity why the letter is inadmissible.  *Cf. Edmond v. Collins*, 8 F.3d 290, 293 n.7 (5th Cir. 1993) (explaining that a party must assert specific objections and cannot re-urge the same argument from initial briefing).

## XI

The only claims on which the district court erred in granting summary judgment are Brenyah's Title VII and Section 1981 hostile-work-environment claims.  Because these two claims have the same elements, we analyze them together.  *See EEOC v. WC&M Enters.*, 496 F.3d 393, 399 (5th Cir. 2007) (Title VII); *Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 399–400 (5th Cir. 2021) (Section 1981).

## A

To prove a hostile work environment claim under Title VII or Section 1981, a plaintiff must show that: (1) she is a member of a protected group; (2) she suffered unwelcome harassment; (3) the harassment was based on her membership in the protected group; (4) the harassment affected a term, condition, or privilege of employment; and (5) the employer knew or should have known of the harassment and failed to take prompt remedial action. *WC&M Enters.*, 496 F.3d at 399; *Johnson*, 7 F.4th at 399–400.

No. 25-40200

B

The parties dispute whether Brenyah has established a genuine dispute of material fact on the last two prongs of her hostile-work-environment claims. Brenyah has met her burden as to both.

1

First, Brenyah has shown a genuine dispute of material fact as to whether the harassment she experienced affected a term, condition, or privilege of employment.

For harassment to affect a term, condition, or privilege of employment, it must be "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Hernandez*, 670 F.3d at 651 (quoting *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)). "Harassment is sufficiently 'severe or pervasive enough' to create a hostile work environment when it is 'objectively hostile or abusive'—meaning 'an environment that a reasonable person would find hostile or abusive'—and is subjectively perceived by the victim as abusive." *Johnson*, 7 F.4th at 400 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)).

"The objective inquiry . . . requires that the court consider 'all the circumstances,' including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Harris*, 510 U.S. at 23). "[S]imple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (citation omitted); *Wantou v. Wal-Mart Stores Tex., LLC*, 23 F.4th 422, 433 (5th Cir. 2022). Second-hand harassment is relevant when

18

assessing the totality of the circumstances but is "less objectionable than harassment directed at the plaintiff." *Arredondo v. Elwod Staffing Servs., Inc.*, 81 F.4th 419, 433 (5th Cir. 2023) (quoting *Johnson v. TCB Constr. Co.*, 334 F. App'x 666, 671 (5th Cir. 2009)). The harassment "must affect [the employee's] work environment." *Gowesky v. Singing River Hosp. Sys.*, 321 F.3d 503, 510 (5th Cir. 2003); *see Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63–64 (2006) (noting that Title VII's substantive provision is "limited to discriminatory actions that affect the terms and conditions of employment"—unlike its anti-retaliation provision, which extends to "actions not directly related to [a plaintiff's] employment or [that caused] him harm *outside* the workplace").

To support these claims, Brenyah points to her deposition testimony, Dike's deposition testimony, and e-mails documenting frequent harassing incidents at Bay Area Hospital, which included: (1) comments by Hispanic nurses that their African food "st[ank]," (2) comments by a Hispanic nurse that black people "play the race card," that a black nurse "[wa]s no longer Black" after visiting the Philippines and "upgraded" his race by marrying a Filipino**,** and that she "ha[d] a 'thing for Filipinos,'" preferring them over black employees, (3) co-workers' mockery of Brenyah's Ghanaian accent; and (4) Sewell's statement that minorities cannot discriminate. Brenyah also offers evidence of harassment that Dike suffered, some of which she witnessed, including: (1) being told by a Hispanic nurse to stay twelve feet away due to his race; (2) being reassigned away from patients to accommodate their desire not to be treated by a black nurse; and (3) being called racial slurs. She also provides evidence related to the incident at Doctors Regional, including: (1) employee reports that she was rude, unprofessional, and causing a disturbance at Doctors Regional; and

(2) Sewell's statement that he intended to issue her a disciplinary action for this behavior.

Brenyah asserts that the incidents at Bay Area Hospital occurred almost every shift and impaired her work, caused her to question how she could function in such an environment, and made her feel "less than human." She also offers evidence that these incidents, as well as the incident at Doctors Regional, impacted her mental health, pointing to counseling records showing that she was distressed, traumatized, and afraid of being harmed.

A reasonable jury could rule in Brenyah's favor on this element. Her evidence indicates that the alleged discriminatory conduct at Bay Area Hospital happened frequently—almost every shift. Her deposition testimony indicates that her work performance suffered as a result. Although the record does not show that the conduct was physically threatening, some of her co-workers' comments were potentially humiliating, as opposed to mere offensive utterances. *See Johnson*, 7 F.4th at 400.

The second-hand harassment that Dike experienced also weighs in Brenyah's favor when assessing the totality of the circumstances. *See Arredondo*, 81 F.4th at 433. Brenyah's evidence related to the Doctors Regional incident is also relevant. Although Doctors Regional was not Brenyah's workplace and she was on medical leave at the time of the incident, CCMC employees' interactions with her caused professional consequences, as evidenced by the multiple reports that made it to Sewell's desk and caused him to consider issuing Brenyah a disciplinary action. *See Burlington N.*, 548 U.S. at 63–64 (explaining that the reach of Title VII's substantive provision is limited to actions "directly related to [a plaintiff's] employment"); *Gowesky*, 321 F.3d at 510 (explaining that the harassment "must affect [the employee's] working environment").

No. 25-40200

2

Second, Brenyah has shown a genuine dispute of material fact as to whether CCMC knew or should have known of the harassment and failed to take prompt remedial action.

When an employer, once informed of alleged harassment, "takes prompt remedial action to protect the claimant," it may avoid liability. *Stewart v. Miss. Transp. Comm'n*, 586 F.3d 321, 329 (5th Cir. 2009) (quoting *Hockman v. Westward Commc'ns, LLC*, 407 F.3d 317, 329 (5th Cir. 2004)). "'Prompt remedial action' must be 'reasonably calculated' to end the harassment." *Id.* (quoting *Hockman*, 407 F.3d at 324). An employer that "t[akes] the allegations seriously," "conduct[s] prompt and thorough investigations," and "immediately implement[s] remedial and disciplinary measures based on the results of such investigations" satisfies this prong. *Hudson v. Lincare, Inc.*, 58 F.4th 222, 230 (5th Cir. 2023) (quoting *Carmon v. Lubrizol Corp.*, 17 F.3d 791, 795 (5th Cir. 1994)).

CCMC contends that it did take prompt remedial action, asserting that after Brenyah advised Sewell of the alleged harassment, Sewell and Goodwine immediately investigated, including by interviewing employees on the unit and coaching nurses who had made the allegedly discriminatory comments. The two men then met with Brenyah to share their findings approximately a month after her first complaint and offered her the option to transfer to a different unit.

But Brenyah points to other evidence that CCMC's investigation was not prompt, thorough, or transparent, including: (1) discrepancies in Sewell's and Goodwine's testimony about the investigation and their interview records; (2) Goodwine's statement in his deposition testimony that "there was an investigation file" and he "most definitely took interview notes," when CCMC produced no investigation file or notes in discovery;

21

(3) the fact that a black employee on the unit was not interviewed, contrary to Goodwine's assertion; (4) the fact that statements allegedly corroborating Brenyah and Dike's allegations were left out of the investigation summary; (5) the fact that Brenyah and Dike were not allowed to review or sign the statements they made in their interviews, contrary to usual practice; and (6) the fact that no interview summaries were created, contrary to usual practice. Brenyah also offers evidence that Sewell and Goodwine told her that "the cliques were not going anywhere," and that the harassing behavior continued after the investigation.

A reasonable jury could rule for Brenyah on this prong of her hostile-work-environment claims. The record belies her assertion that CCMC completely failed to act in response to her reports of discrimination and harassment. But she has pointed to evidence that CCMC's investigation was insufficiently prompt and thorough. She has also marshaled evidence that the actions CCMC took based on its investigation were not "reasonably calculated to end the harassment," *Stewart*, 586 F.3d at 329 (quoting *Hockman*, 407 F.3d at 324), given Goodwine's statement that some of the behavior would continue and Brenyah's testimony that that behavior did, in fact, continue. Thus, although CCMC offers competing evidence on this point, Brenyah's record evidence is sufficient to establish a genuine dispute of material fact as to this prong of her claims.

\* \* \*

Because Brenyah has met her burden as to all prongs of her Title VII and Section 1981 hostile-work-environment claims, we conclude that the district court erred in granting summary judgment on these claims, to the extent they are based on facts contained in Brenyah's first, timely charge of discrimination.

No. 25-40200

## XII

We AFFIRM the district court's grant of summary judgment as to all of Brenyah's claims except for her Title VII and Section 1981 hostile-work-environment claims. As to those two claims only, and to the extent they are based on facts contained in Brenyah's first, timely charge of discrimination, we REVERSE and REMAND for further proceedings.[1]

---

[1] CCMC argues in the alternative that, in the event that CCMC is not entitled to summary judgment as to one or more claims and Brenyah is entitled to backpay, Brenyah failed to mitigate her damages. **Red Br. at 51.** The district court may, if appropriate, consider this argument in the first instance on remand. *Great Am. Ins. Co. v. AFS/IBEX Fin. Servs., Inc.*, 612 F.3d 800, 808 (5th Cir. 2010) (remanding to the district court to consider in the first instance an issue on the merits of which it "never opined").